# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

ASHLEY DIAMOND,

                    Plaintiff,

     v.

TIMOTHY WARD, individually and in
his official capacity as Commissioner of
the Georgia Department of Corrections;
SHARON LEWIS, individually and in
her official capacity as the Statewide
Medical Director of the Georgia
Department of Corrections; JAVEL
JACKSON, individually and in her
official capacity as Director of Mental
Health of the Georgia Department of
Corrections; AHMED HOLT,
individually and in his official capacity
as Assistant Commissioner, Facilities
Division, of the Georgia Department of
Corrections; ROBERT TOOLE,
individually and in his official capacity
as Director of Field Operations of the
Georgia Department of Corrections;
BENJAMIN FORD, individually and in
his official capacity as Warden of the
Georgia Diagnostic and Classification
Prison; JACK SAULS, in his official
capacity as Assistant Commissioner of
the Health Services Division of the
Georgia Department of Corrections;
BROOKS BENTON, individually and in
his official capacity as Warden of the

Case No. _____

**COMPLAINT**

Coastal State Prison; GRACE ATCHISON, individually and in her official capacity as Statewide Prison Rape Elimination Act Coordinator of the Georgia Department of Corrections; LACHESHA SMITH, in her individual capacity; ARETHA SMITH, in her individual capacity; and RODNEY JACKSON, in his individual capacity,

Defendants.

COMES NOW, Plaintiff Ashley Diamond who, by and through her undersigned attorneys, states and alleges as follows.

## INTRODUCTION

1.     Ashley Diamond is a transgender woman who—despite having successfully sued officials from the Georgia Department of Corrections ("GDC"), including Defendant Statewide Medical Director Sharon Lewis, for constitutional violations in 2015—is once again trying to survive brutal and unrelenting abuse and mistreatment as a result of Defendants' actions and omissions.

2.     Ms. Diamond's 2015 lawsuit, *Diamond v. Owens* ("*Diamond I*"), 131 F. Supp. 3d 1346 (M.D. Ga. 2015), challenged GDC's policies of failing to protect transgender people from sexual assault and failing to provide them adequate treatment for gender dysphoria while in GDC custody.

3. Ms. Diamond's case received national attention and was the catalyst for GDC's rescission of its unconstitutional "freeze frame" policy that prevented transgender incarcerated people from accessing medically necessary hormone therapy unless they could prove they had already started it prior to incarceration. The Court found that Ms. Diamond's constitutional rights to protection from sexual assault and provision of treatment for gender dysphoria were clearly established. *See Diamond I*, 131 F. Supp. 3d at 1374–75, 1379–80.

4. As set out in *Diamond I*, over the course of three years, Ms. Diamond was brutally and repeatedly sexually assaulted—nearly a dozen times—by men in the GDC facilities where she was housed. Despite knowing about Ms. Diamond's heightened risk of sexual assault and her repeated brutalization, GDC officials, including Defendant Statewide Medical Director Sharon Lewis, the former GDC Commissioner, and the wardens at her prisons, failed to protect her. As a result, Ms. Diamond's pleas went unanswered and the assaults continued unabated, leading her to develop and be diagnosed with Post-Traumatic Stress Disorder ("PTSD").

5. Likewise, during GDC's three-year incarceration (2012–2015) of Ms. Diamond, which led to *Diamond I*, Defendant Sharon Lewis, GDC's Statewide Medical Director, and other GDC officials refused to provide Ms. Diamond with any treatment for her gender dysphoria, despite knowing that their failure to do so was

causing Ms. Diamond physical pain and enormous mental distress. This distress led to self-castration efforts and self-harm, including suicidal ideation and suicide attempts. The abuse stopped only when Ms. Diamond was released on parole on August 31, 2015.

6.     Following a parole violation, Ms. Diamond once again finds herself at the mercy of GDC which has—once again—failed to protect her from relentless sexual victimization. As a result, she has been forced to file this new lawsuit, *Diamond II*.

7.     The *Diamond II* Defendants—including Commissioner Ward, Assistant Commissioner Holt, Statewide Medical Director Lewis, Statewide Mental Health Director Jackson, Director of Field Operations Toole, and Statewide Prison Rape Elimination Act Coordinator Atchison—are undeniably aware of the significant risks of sexual assault Ms. Diamond faces as a transgender woman housed in men's prisons. Yet Defendants have again refused her requests to be housed in a women's facility and have again placed her in a series of men's prisons where she lives in constant fear of sexual abuse—fears that have repeatedly materialized.

8.     In addition to Defendants' awareness of Ms. Diamond's high risk of sexual assault and her need for adequate medical treatment for her gender dysphoria,

Ms. Diamond, through counsel, sent Defendants nine Notices of Constitutional Violations, including seven letters and two emails, ("Notice(s) of Violations") between May 1, 2020, and November 6, 2020. These Notices repeatedly notified Defendants of the serial sexual assaults, abuse, and suffering Ms. Diamond was experiencing as a result of their decisions. Yet Defendants took no meaningful action, and Ms. Diamond's sexual victimization and suffering continue unabated.

9.      Because of Defendants' housing decisions and practice of refusing to house transgender women in women's prisons or provide similarly safe housing that does not involve solitary confinement (hereinafter "non-segregated housing placement"), Ms. Diamond, like countless other transgender women in GDC custody, has repeatedly been the victim of violent yet foreseeable sexual assaults. In the twelve months she has been back in GDC custody, Ms. Diamond has been sexually assaulted on **<u>fourteen</u>** separate occasions, including eight at her current facility. She has endured sexual assaults, abuse, and harassment from GDC officials and incarcerated people alike.

10.      The repeated sexual violence Ms. Diamond has endured has injured her physically and emotionally, causing her tremendous pain and ongoing suffering.

11.      Defendants have also refused to provide Ms. Diamond with constitutionally adequate treatment for gender dysphoria, which has imperiled her

physical and mental health. As a result of GDC's healthcare denials, Ms. Diamond has experienced severe physical and mental anguish, including depression, anxiety, suicidal ideation and suicide attempts, and self-harm. Ms. Diamond has also repeatedly attempted to castrate herself to stop the flow of testosterone in her body—a desperate form of self-treatment that has led to severe medical complications such as difficulty urinating.

12.    The abuse and neglect that Ms. Diamond has experienced are all the more egregious because Defendants have willfully ignored a prior judicial finding that the very same conduct Defendants repeat qualifies as cruel and unusual punishment under the Eighth Amendment and a violation of clearly established constitutional rights.

13.    Ms. Diamond's unrelenting sexual victimization is the result of Defendants' long-standing and widespread practice of housing transgender women like Ms. Diamond in men's prisons without adequate safeguards despite their individual circumstances and the obvious risk of sexual abuse they face as women housed in men's prisons. Through this policy and practice, Defendants treat Ms. Diamond differently, without legitimate justification, from similarly situated cisgender women (*i.e.*, non-transgender women) who are housed in women's

facilities and therefore shielded from sexual predation from incarcerated cisgender men.

14.     Having fully exhausted her administrative remedies to no avail, Ms. Diamond seeks judicial relief pursuant to 42 U.S.C. § 1983 to ensure that Defendants take reasonable steps to protect her from sexual assault and provide her constitutionally adequate medical care.

15.     In other words, Ms. Diamond seeks a court order requiring Defendants to do what they know they must do, what they have previously been notified is their constitutional obligation to do, *but have simply refused to do*.

## JURISDICTION AND VENUE

16.     This action arises under 42 U.S.C. § 1983.

17.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331, which confers original jurisdiction to federal district courts in civil actions arising under the U.S. Constitution and the laws of the United States, and § 1343(a)(3), which confers original jurisdiction to federal district courts in civil actions to redress the deprivation, under color of any State law, of any right secured by the U.S. Constitution. This action seeks to redress the deprivation of rights secured by the Eighth Amendment and Fourteenth Amendment to the U.S. Constitution.

18.     This Court has personal jurisdiction over each Defendant because each is a resident of Georgia who was employed in Georgia and acted under color of state law at all times relevant to this action.

19.     Venue is proper in the Northern District under 28 U.S.C. §§ 1391(b)(1) and (b)(2) because multiple Defendants reside in this District and because a substantial part of the events giving rise to Ms. Diamond's claims occurred in this District.

## PARTIES

20.     Plaintiff Ashley Diamond is a forty-two-year-old Black transgender woman from Rome, Georgia who is currently in GDC custody. She was also the lead plaintiff in *Diamond I*, a 2015 lawsuit challenging unconstitutional conditions of confinement experienced by transgender people in GDC custody. She is currently being held at Coastal State Prison in Chatham County, Georgia.

### Defendants (collectively, the "*Diamond II* Defendants")

21.     At all times relevant to the events at issue in this case, Defendant Timothy C. Ward is and was the Commissioner of GDC. In his position as Commissioner, Defendant Ward exercises final policy and decision-making authority at GDC, including over policies that relate to the care, treatment, and housing placement of transgender people and people with gender dysphoria in GDC.

8

Defendant Ward also exercises control over all personnel who enforce those policies. Defendant Ward adopts, enforces, and ratifies policies, customs, and widespread practices concerning the housing and safety of transgender people and the evaluation and treatment of gender dysphoria. Defendant Ward has the authority to issue directives concerning the care, treatment, and housing placements of transgender individuals in GDC custody. Defendant Ward has the authority to issue directives concerning the training and supervision of GDC personnel. Defendant Ward is sued in his individual and official capacities.

22.    At all times relevant to the events at issue in this case, Defendant Sharon Lewis is and was the Statewide Medical Director for GDC and a member of the Statewide Classification Committee. In these roles, Defendant Lewis exercises final policy and decision-making authority regarding the care, treatment, safety, and housing placements of transgender people and people with gender dysphoria in GDC. Defendant Lewis controls, trains, and supervises GDC healthcare personnel, and adopts and enforces policies, customs, and practices concerning the evaluation and treatment of people with gender dysphoria within GDC. Defendant Lewis adopts and enforces policies, customs, and practices concerning the housing and safety of transgender people. Defendant Lewis is also responsible for approving or denying GDC treatment plans and requests for gender dysphoria treatment; responding to

identified problems, including grievance appeals; determining housing placements for transgender people, including whether they will be placed in men's or women's facilities; responding to incidents of sexual assault; conducting periodic safety assessments; and approving or denying the placement and transfer requests of transgender individuals. Defendant Lewis is sued in her official and individual capacities.

23.    At all times relevant to the events at issue in this case, Defendant Javel Jackson (hereinafter "Defendant J. Jackson") is and was the Statewide Mental Health Director at GDC and a member of the Statewide Classification Committee. In these roles, Defendant J. Jackson exercises final policy and decision-making authority regarding the care, treatment, safety, and housing placements of transgender people and people with gender dysphoria in GDC. Defendant J. Jackson controls, trains, and supervises GDC healthcare personnel, and adopts and enforces policies, customs, and practices concerning the evaluation and treatment of people with gender dysphoria within GDC. Defendant J. Jackson adopts and enforces policies, customs, and practices concerning the housing and safety of transgender people. Defendant J. Jackson is also responsible for approving or denying GDC treatment plans and requests for gender dysphoria treatment; responding to identified problems; determining housing placements for transgender people, including

whether they will be placed in men's or women's facilities; responding to incidents of sexual assault; conducting periodic safety assessments; and approving or denying the placement and transfer requests of transgender individuals. Defendant J. Jackson is sued in her official and individual capacities.

24. At all times relevant to the events at issue in this case, Defendant Ahmed Holt is and was the Assistant Commissioner of the Facilities Division at GDC and a member of the Statewide Classification Committee. In these roles, Defendant Holt exercises final policy and decision-making authority regarding the safety and housing placements of transgender people and people with gender dysphoria in GDC. Defendant Holt controls, trains, and supervises GDC personnel responsible for housing and safeguarding people in GDC custody, including transgender people and people who have experienced sexual assault. Defendant Holt adopts and enforces policies, customs, and practices concerning the housing and safety of transgender people. He is also responsible for determining housing placements for transgender people, including whether they will be placed in men's or women's facilities; responding to incidents of sexual assault; conducting periodic safety assessments; and approving or denying the placement and transfer requests of incarcerated transgender individuals. Defendant Holt is sued in his official and individual capacities.

11

25.     At all times relevant to the events at issue in this case, Defendant Robert Toole is and was the Director of Field Operations at GDC and a member of the Statewide Classification Committee as well as the Georgia Diagnostic and Classification Prison's ("GDCP") Facility Classification Committee. In these roles, Defendant Toole is responsible for overseeing daily operations of GDC facilities and assisting with determinations concerning where transgender people are housed. Defendant Toole had a duty to reasonably protect incarcerated transgender people like Ms. Diamond from a substantial risk of serious harm. Defendant Toole is sued in his official and individual capacities.

26.     At all times relevant to the events at issue in this case, Defendant Benjamin Ford is and was the Warden of GDCP. In this role, Defendant Ford exercises ultimate authority, direction, and control over GDCP and its personnel. Defendant Ford is also responsible for recommending whether to transfer transgender women placed in GDCP to a men's or women's facility; for taking reasonable precautionary measures to minimize the foreseeable risk of sexual assault faced by transgender women housed in GDCP; and for taking effective corrective measures after being notified that transgender women in GDCP have experienced sexual assault, abuse, or harassment. Defendant Ford is also responsible for ensuring the health and safety of all incarcerated people at GDCP and that all aspects of the

facility comply with GDC policy and state and federal law, participating in housing decisions for incarcerated people who face a heightened risk of sexual assault and responding to allegations of sexual assault made by incarcerated people within GDCP. Defendant Ford is responsible for the training and supervision of all GDCP personnel. Defendant Ford is sued in his individual capacity.

27.     At all times relevant to the events at issue in this case, Defendant Brooks Benton was the Warden of Coastal State Prison ("Coastal"). In his capacity as Warden, Defendant Benton exercises ultimate authority, direction, and control over Coastal and its personnel. Defendant Benton is responsible for taking reasonable precautionary measures to minimize the foreseeable risk of sexual assault faced by transgender women housed in Coastal and for taking effective corrective measures after being notified that a transgender woman housed at Coastal has experienced sexual assault, abuse, or harassment. Defendant Benton is also responsible for ensuring the health and safety of all incarcerated people at Coastal and that all aspects of the facility comply with GDC policy and state and federal law, participating in housing decisions for incarcerated people who face a heightened risk of sexual assault and responding to allegations of sexual assault made by incarcerated people within Coastal. Defendant Benton is responsible for the training

and supervision of all Coastal personnel. Defendant Benton is sued in his official and individual capacities.

28.    At all times relevant to the events at issue in this case, Defendant Randy Sauls is and was the Assistant Commissioner of the Health Services Division at GDC. In this role, Defendant Sauls exercises final policy and decision-making authority regarding the care and treatment of transgender people with gender dysphoria. Defendant Sauls controls, trains, and supervises GDC healthcare personnel, including Defendants Lewis and J. Jackson, and adopts and enforces policies, customs, and practices concerning the evaluation and treatment of people with gender dysphoria within GDC. Defendant Sauls is responsible for monitoring and evaluating the quality and appropriateness of care, ensuring that people in GDC custody receive necessary treatment plans and treatment for gender dysphoria, and responding to identified problems. Defendant Sauls is sued in his official and individual capacities.

29.    At all times relevant to the events at issue in this case, Defendant Grace Atchison is and was the Statewide Prison Rape Elimination Act ("PREA") Coordinator and a member of the Statewide Classification Committee. In these roles, Defendant Atchison controls, trains, and supervises GDC PREA compliance managers and is responsible for ensuring that GDC personnel, including wardens,

take adequate steps to respond to and prevent sexual assault and abuse at GDC facilities. Defendant Atchison exercises final policy and decision-making authority regarding the safety and housing placements of transgender people and people with gender dysphoria in GDC. Defendant Atchison adopts and enforces policies, customs, and practices concerning the housing and safety of transgender people. Defendant Atchison is also responsible for determining housing placements for transgender people, including whether they will be placed in men's or women's facilities; responding to incidents of sexual assault against incarcerated transgender people; reviewing sexual abuse incident investigations and recommendations and ensuring implementation of facility improvements to minimize similar incidents of sexual abuse; conducting periodic safety assessments; and approving or denying the placement and transfer requests of transgender individuals. Defendant Atchison is sued in her official and individual capacities.

30.     At all times relevant to the events at issue in this case, Defendant Aretha Smith (hereinafter "Defendant A. Smith") was a correctional officer at GDCP who had a duty to ensure the safety of people in GDC custody. She is sued in her individual capacity.

31.     At all times relevant to the events at issue in this case, Defendant LaChesha Smith (hereinafter "Defendant L. Smith") was the PREA Compliance

Manager at GDCP who had a duty to respond to and prevent sexual abuse in GDCP and to ensure the safety of people in GDC custody. She is sued in her individual capacity.

32.     At all times relevant to the events at issue in this case, Defendant Rodney Jackson (hereinafter "Defendant R. Jackson") was a Unit Manager at Coastal, where he has a duty to ensure the safety of people in GDC custody. He is sued in his individual capacity.

## FACTUAL ALLEGATIONS

### Background on Ms. Diamond

33.     Ms. Diamond is a forty-two-year-old woman. She is also transgender.

34.     A person's sex is determined by sex-related characteristics, including hormones, external and internal morphological features, external and internal reproductive organs, chromosomes, and gender identity. These characteristics are not always in alignment.

35.     Gender identity—a person's core internal sense of their own gender— is the primary factor in determining a person's sex. There is a medical consensus that gender identity is innate and immutable.

36.     The phrase "sex assigned at birth" refers to the sex recorded on a person's birth certificate at the time of birth. Typically, a person is assigned a sex on

their birth certificate solely based on the appearance of external reproductive organs at the time of birth.

37.    Transgender individuals are people whose gender identity diverges from the sex they were assigned at birth. Cisgender individuals are people whose gender identity aligns with the sex they were assigned at birth.

38.    Ms. Diamond was diagnosed with gender dysphoria at the age of fifteen.[1]

39.    Gender dysphoria is a serious medical condition that appears in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-V"). Gender dysphoria causes severe psychological suffering and can lead to physical injury when it is not properly treated.

40.    As medically-necessary treatments for her gender dysphoria, Ms. Diamond has lived in accordance with her female gender identity since she was fifteen years old and taken hormone therapy since the age of seventeen. As a result

---

[1] The terms "gender identity disorder," "transsexualism," and "transsexual" are used interchangeably in GDC records to describe gender dysphoria, along with people living with the condition, and should be treated as synonyms for purposes of this Complaint.

of her early adolescent transition, Ms. Diamond has developed full breasts and a feminine shape and did not develop facial hair until her adulthood when her treatments were interrupted by GDC.

### The Prior Pattern of Violence, Abuse, and Unconstitutional Neglect Ms. Diamond Experienced in GDC

41.     When Ms. Diamond first entered GDC custody on April 12, 2012, in connection with a nonviolent offense, she was an openly transgender woman with a feminine appearance.

42.     During her intake screening, she notified GDC personnel that she was a transgender woman receiving hormone therapy for her gender dysphoria and requested placement in a women's facility because she feared being sexually abused and assaulted in male facilities.

43.     However, GDC officials—including Defendant Lewis—ignored Ms. Diamond's health and safety requests, despite knowing the risks she faced, and subjected her to a horrific sequence of constitutional violations over a multiyear period.

44.     *First*, Defendant Lewis and other GDC officials disregarded Ms. Diamond's safety concerns and housed her in a series of men's prisons where she foreseeably became a victim of sexual assault. Defendant Lewis and others also

ignored their own clinicians' requests to have Ms. Diamond transferred to a safer facility.

45.    Over the course of three years in GDC custody, Ms. Diamond was sexually assaulted almost a dozen times while GDC officials, including Defendant Lewis, sat idle despite her reports of the unrelenting attacks and her pleas for protection.

46.    In May 2012, less than a month after arriving at GDC, Ms. Diamond was brutally gang-raped by six members of a gang, who punched her, stomped on her, and knocked her unconscious. Thereafter, Ms. Diamond was sexually assaulted more than **ten** times before her August 2015 release from GDC custody.

47.    In 2013, following her second assault in GDC custody, GDC clinicians determined that Ms. Diamond was suffering from PTSD due to her sexual assaults and urged that she be transferred to a safer facility for the sake of her physical and mental well-being. To manage her PTSD symptoms, which include nightmares, flashbacks, hypervigilance, dissociation, and difficulty sleeping, Ms. Diamond was also prescribed a sedative called Trazodone.

48.    Ms. Diamond repeatedly notified GDC officials—including Defendant Lewis—of her sexual assaults and begged to be transferred to a safer facility. Rather than heed her urgent requests for safe housing, GDC officials instructed

Ms. Diamond to "guard her booty" and "be prepared to fight." They also openly acknowledged that GDC was unable to keep Ms. Diamond safe so long as she remained a transgender woman housed in men's facilities.

49.   *Second*, GDC officials—including Defendant Lewis—denied Ms. Diamond medically necessary gender dysphoria care, including hormone therapy and gender expression allowances, contrary to the recommendations of GDC's own clinicians who confirmed Ms. Diamond's ongoing need for treatment.

50.   Dr. Stephen Sloan, a GDC psychologist with specialized knowledge concerning the treatment of gender dysphoria, performed an individual assessment of Ms. Diamond in which he concluded that hormone therapy and outward female gender expression were medically necessary treatments for her gender dysphoria. Dr. Sloan also found that denying Ms. Diamond these treatments jeopardized her physical and psychological well-being, leading to thoughts of suicide and attempts at self-harm.

51.   Despite Dr. Sloan's conclusions, Defendant Lewis and other GDC officials refused to initiate care. Ms. Diamond's gender dysphoria consequently remained untreated, leading her to become depressed, attempt suicide, and attempt to castrate herself as a form of self-treatment—actions that required emergency hospitalizations and care.

## Ms. Diamond's Prior Lawsuit Against GDC, *Diamond I*

52.     On February 19, 2015, Ms. Diamond commenced *Diamond I*, a lawsuit alleging that Defendant Lewis, the then-GDC Commissioner, the wardens of Ms. Diamond's facilities, and other GDC personnel violated her rights under the Eighth Amendment by denying her medically necessary gender dysphoria treatment and protection from sexual assault.

53.     During the litigation, Defendant Lewis and other GDC officials did not dispute their obligation to protect Ms. Diamond from sexual assault under the Eighth Amendment. Defendant Lewis and her co-defendants also acknowledged that Ms. Diamond had gender dysphoria, a serious medical need requiring care under the Eighth Amendment.

54.     On April 5, 2015, the United States Government, through the Department of Justice, filed a Statement of Interest affirming its view that "[f]ailure to provide individualized and appropriate medical care for [incarcerated people] suffering from gender dysphoria violates the Eighth Amendment's prohibition on cruel and unusual punishment." Statement of Interest of the United States at 1, *Diamond I*, No. 5:15-cv-50 (M.D. Ga. Apr. 5, 2015), ECF No. 29.

55.     Two days later, on April 7, 2015, GDC's counsel announced that GDC had rescinded the challenged unconstitutional policy denying medically necessary

21

treatment for incarcerated individuals with gender dysphoria and thereafter agreed to provide Ms. Diamond with access to hormone therapy.

56.    On September 14, 2015, the U.S. District Court for the Middle District of Georgia denied the defendants' motion to dismiss and allowed Ms. Diamond's claims in *Diamond I* to proceed against all defendants, including Defendant Lewis. *Diamond v. Owens*, 131 F. Supp. 3d 1346 (M.D. Ga. 2015).

57.    The *Diamond I* Court found that Ms. Diamond successfully stated claims that Defendant Lewis and GDC officials, including the wardens at the prisons where she was housed, subjected Ms. Diamond to cruel and unusual punishment under the Eighth Amendment by failing to protect her from sexual assault and showing deliberate indifference to her gender dysphoria treatment needs. *Id.*

58.    The *Diamond I* Court criticized GDC's placement decisions, noting that Defendant Lewis and her codefendants continued to transfer Ms. Diamond to similarly unsafe facilities even though her "transgender status made her more vulnerable to sexual assaults." *Id.* at 1356.

59.    The *Diamond I* Court held Ms. Diamond had exhausted her administrative remedies by alerting Defendant Lewis and GDC officials to her ongoing safety concerns and denials of medical care. *Id.* at 1359–69.

60.     The *Diamond I* Court also held that Defendant Lewis and the GDC wardens responsible for Ms. Diamond's care were not entitled to qualified immunity with respect to any of Ms. Diamond's claims because she had clearly established constitutional rights to be protected from sexual assault and to receive medically necessary gender dysphoria care. *Id.* at 1374–75, 1379–80, 1384–85.

61.     Ms. Diamond was released on August 31, 2015 for the sake of the public interest, subject to a nine-year term of parole supervision.

62.     On February 5, 2016, Ms. Diamond settled her lawsuit, securing policy changes related to medical care for transgender people incarcerated in GDC and a monetary settlement to compensate her for her injuries.

63.     On the same day in February 2016, shortly after the resolution of Ms. Diamond's individual case, the Department of Justice and U.S. Attorney's Offices across Georgia announced they were commencing a joint investigation concerning the treatment of lesbian, gay, bisexual, and transgender ("LGBT") people within GDC custody.

64.     The statewide investigation into GDC began after the Department of Justice received allegations that transgender people in GDC facilities experienced high rates of sexual violence, due to systemic constitutional violations regarding the failure to protect, and incidences of staff abuse.

23

65.     Although the Department of Justice's statewide investigation is ongoing, early reports have confirmed that sexual violence against transgender people and GDC's failure to protect them remain rampant problems within GDC to the present day.

## Defendants Have Placed Ms. Diamond at a Series of Men's Prisons Since Her Return to GDC Custody, Despite Her Known and Obvious Risk of Sexual Assault

66.     On October 29, 2019, during her fifth consecutive year of parole supervision, Ms. Diamond was sent back to GDC following a parole violation.

67.     The *Diamond II* Defendants were aware that Ms. Diamond was a transgender woman with a long history of sexual victimization in GDC custody who is likely to suffer additional attacks if she is housed in men's prisons without adequate safeguards. She even disclosed in her intake that she feared ongoing victimization in men's prisons and requested placement in a women's facility for purposes of her safety.

68.     Despite these known risks, Defendants Ward, Lewis, J. Jackson, Holt, Toole, Ford, and Atchison, working in concert, assigned Ms. Diamond placements at a series of men's prisons—GDCP, followed by Coastal—the precise type of facility where she previously endured abuse and attacks.

69.    As   a   foreseeable   result   of   Defendants'   placement   decisions, Ms. Diamond has once again become the victim of brutal and repeated assaults. Between October 29, 2019 and June 3, 2020, Ms. Diamond was sexually assaulted **six different times at GDCP**, including three times at the hands of GDC staffers. Since her June 3, 2020 transfer to **Coastal**, Ms. Diamond has been assaulted **eight more times**—all because Defendants have failed to revisit their flawed and discriminatory housing decisions or take reasonable steps to protect her.

### *Ms. Diamond Suffered Repeated Sexual Assaults, Abuse, and Harassment at GDCP, Beginning within Days of Her Arrival*

70.    On or about November 2, 2019, approximately three days after her arrival at GDCP, Ms. Diamond was violently sexually assaulted by a man who entered her cell while she was sleeping.

71.    Ms. Diamond, who had taken Trazodone, a prescribed sedative that induced sleep, was violently awakened at approximately 4:30 in the morning to find her pants down and a man on top of her sexually assaulting her. After the assault, Ms. Diamond was left injured and bleeding.

72.    On or about November 9, 2019, roughly one week after her first assault, Ms. Diamond was sexually assaulted again at approximately 10:30 a.m. when all the cells were unlocked for lunch. A different male assailant entered Ms. Diamond's

cell, pushed her into the corner, and began groping her and forcibly kissing her. Ms. Diamond yelled out for help, and a few other incarcerated people came running to check on her, causing her attacker to run away.

73.     Ms. Diamond notified Defendant L. Smith, the PREA Compliance Manager at GDCP, that she had been assaulted. She also gave Defendant L. Smith a stack of sexually harassing and threatening notes she had received from would-be male assailants during her first two weeks at GDCP.

74.     Defendant L. Smith notified Defendants Ford and Atchison and other GDC officials about Ms. Diamond's PREA complaint and the threats Ms. Diamond had received, pursuant to her duty "to ensure all required personnel are notified that an incident has occurred." GDC's Prison Rape Elimination Act (PREA) Sexually Abusive Behavior Prevention & Intervention Program, Standard Operating Procedures (SOP) 208.06, Att. 7 (2018) (hereinafter "GDC PREA Policy").

75.     On a later date, Ms. Diamond and three other transgender people complained to Defendant L. Smith about threats from gang members who said they were going to kill Ms. Diamond. Defendant L. Smith dismissed the warning.

## *Ms. Diamond Was Sexually Assaulted by a GDC Staffer in March 2020*

76.    On or about March 10, 2020, a GDC staff member known to Ms. Diamond as "Nurse Lucas" grabbed Ms. Diamond's breasts, asked, "Are they real?" and mocked Ms. Diamond for being transgender.

77.    In doing so, Nurse Lucas disregarded federal law and GDC policy, which prohibit staff members from touching the breasts of incarcerated individuals for reasons unrelated to their official job duties. *See* GDC PREA Policy, SOP 208.06(III)(L)(5).

78.    Nurse Lucas's actions were unlawful sexual abuse and sexual harassment that had no valid medical or penological purpose.

79.    Nurse Lucas's assault of Ms. Diamond was witnessed by other incarcerated people and multiple GDC staffers who report to Defendant Ford. The assault was also captured on GDC surveillance video.

80.    On or about March 13, 2020, Ms. Diamond filed a PREA complaint about her assault by Nurse Lucas and notified Defendant L. Smith, GDCP's PREA Compliance Manner.

81.    Rather than respond to Ms. Diamond's PREA complaint, Defendant L. Smith mocked Ms. Diamond and made a comment to the effect that Ms. Diamond was only complaining because she was "interested in fame." This comment, from a

staffer whose role is to prevent and address sexual assault, evinces a discriminatory and dangerous attitude toward the sexual victimization of transgender women. Defendant L. Smith's comments and actions are reflective of a widespread and pervasive pattern by GDC personnel of disregarding the safety needs of incarcerated transgender people in their custody.

82.    Defendants Ward, Lewis, J. Jackson, Holt, Sauls, Toole, Ford, and Atchison were also notified about Nurse Lucas's sexual misconduct through mandatory PREA reporting and communications with Ms. Diamond's counsel. However, they failed to respond to Ms. Diamond's safety needs, despite having the authority and duty to do so.

83.    Instead, Defendants Ward, Lewis, J. Jackson, Holt, Sauls, Toole, Ford, and Atchison allowed Nurse Lucas to remain in continued contact with Ms. Diamond in deliberate indifference to her safety needs, causing her additional anxiety, humiliation, and fear.

84.    Defendants Ward, Lewis, J. Jackson, Holt, Sauls, Toole, Ford, and Atchison's refusal to respond to staff sexual misconduct or revisit Ms. Diamond's placement at GDCP are reflective of a widespread and pervasive pattern of GDC decisionmakers disregarding the safety needs of incarcerated transgender people in their custody and refusing to train and supervise GDC employees.

28

85.     Ms. Diamond spoke about the Nurse Lucas incident with Ms. Withers, the Retaliation Monitor at GDCP. Ms. Withers communicated to Defendants Ford and L. Smith that Ms. Diamond should be transferred to another facility for her safety and her mental health. Ms. Withers also recommended that medication and food be brought to Ms. Diamond's dorm, noting Ms. Diamond's fears of sexual assault and harassment when going to pill call or the dining area. Defendant Ford declined this request.

### *Ms. Diamond Was Sexually Assaulted in April 2020*

86.     In April 2020, Ms. Diamond was performing her work duties as an orderly for GDCP and, as part of her work duties, entered a utility closet.

87.     An incarcerated man, who had been hiding in the closet, jumped out from behind and grabbed Ms. Diamond. The assailant groped Ms. Diamond and tried to forcibly remove her pants. The assailant also exposed his genitals and masturbated on her.

88.     Ms. Diamond reported the incident to Defendant L. Smith, who admitted that she had been warned several times by others that Ms. Diamond's assailant was hiding in the utility closet prior to his attack.

89.     On May 1, 2020, Ms. Diamond, through counsel, sent GDC a First Notice of Violations that notified Defendants Ward, Holt, and Sauls that she had

been subjected to repeated but preventable sexual assaults at GDCP, including by Nurse Lucas openly on video. The Notice explained that Ms. Diamond's sexual assaults had taken place because her safety-based housing requests to be placed in a women's facility or otherwise be protected from sexual assault from incarcerated men had been ignored. The Notice also explained that because of the assaults and ongoing fear, Ms. Diamond's health was deteriorating, and asked them to reassess Ms. Diamond's safety and eligibility for a transfer to a female facility to prevent further attacks.

90.     Ms. Diamond, through counsel, supplied copies of the Notice of Violations to Defendants Lewis, Toole, Ford, Benton, and Atchison, while Defendant J. Jackson also received a copy due to her GDC role.

91.     No action was taken, however, and Ms. Diamond was assaulted again just days later.

### Ms. Diamond Was Sexually Abused by a GDC Officer Over Two Consecutive Days in May 2020

92.     In May 2020, Ms. Diamond was also sexually abused and assaulted over a two-day period by Defendant A. Smith, a GDC corrections officer charged with ensuring Ms. Diamond's safety and care.

93.     On or about May 9, 2020, Defendant A. Smith approached Ms. Diamond while she was working as a GDCP orderly.

94.     Defendant A. Smith ordered Ms. Diamond to enter a small windowless office behind a locked gate that is used by GDC officers and requires a key to enter and exit. Defendant A. Smith entered the office with Ms. Diamond and locked the door behind her, trapping Ms. Diamond in the office with her.

95.     For the next two hours, Defendant A. Smith kept Ms. Diamond locked in the office and engaged in sexually abusive conduct in violation of PREA and GDC's PREA Policy.

96.     Defendant A. Smith stroked Ms. Diamond on her leg and thigh and repeatedly questioned her about her sexual preferences and whom she found sexually attractive at GDCP—actions that were wholly unrelated to her official job duties.

97.     Defendant A. Smith finally released Ms. Diamond from the office two hours later and ordered Ms. Diamond to keep quiet about the incident. She complied out of fear.

98.     One day later, on May 10, 2020, Defendant A. Smith ordered Ms. Diamond into the same room and instructed her to set up a makeshift bed using a mattress, blankets, and pillows from an adjacent closet.

99.   After Ms. Diamond complied with Defendant A. Smith's demands, Defendant A. Smith locked the door to prevent her exit and proceeded to sexually harass and abuse Ms. Diamond for the next four hours.

100.   Defendant A. Smith sat beside Ms. Diamond on the bed and repeatedly stroked Ms. Diamond's buttocks, legs, and thighs. Defendant A. Smith demanded Ms. Diamond show her breasts and genitalia and proceeded to ask Ms. Diamond a series of harassing and sexually explicit questions about her sexual history, genitalia, and gender identity, including "What kind of dicks do you like?", "Have you ever been with a woman?", and "Do you fuck boys or girls?"

101.   Ms. Diamond complied with Defendant A. Smith's demands under duress because of Defendant A. Smith's position of authority over her and out of fear of retaliation.

102.   After Ms. Diamond had endured approximately two hours of abuse, another GDC officer, Scott Ridley, approached the room in which Ms. Diamond was locked and asked to be let into the room. Defendant A. Smith only answered the door after Officer Ridley knocked several times and insisted that she give him access. When Defendant A. Smith finally opened the door, Officer Ridley saw that Ms. Diamond was locked in the office with Defendant A. Smith on a makeshift bed.

103.   Although this was obviously unlawful and abusive conduct, Officer Ridley did not do anything to assist Ms. Diamond or intervene.

104.   After Officer Ridley departed, Defendant A. Smith kept Ms. Diamond locked in the office with her for another two hours and continued engaging in sexually abusive behavior.

105.   Defendant A. Smith's actions were coercive, and Ms. Diamond complied out of fear. Following the assault, Ms. Diamond learned that GDC staff who report to Defendant Ford had spread rumors about the incident throughout GDCP. Ms. Diamond even heard a male GDCP officer refer to her in a racially derogatory manner and say, "I want to know about the n****r who was in the closet fucking the officer."

106.   Defendant A. Smith's assault exacerbated Ms. Diamond's PTSD and left her shocked, horrified, and fearful of future assaults, especially at the hands of GDC staff.

107.   On May 20, 2020, Ms. Diamond, through a Second Notice of Violations, notified Defendants Ward, Holt, Sauls, Atchison, and Ford of the continued sexual harassment and assaults she was experiencing at the hands of GDC staff and described Defendant A. Smith's attack. However, no corrective action was taken. As a result of Defendants Ward, Holt, Sauls, Atchison, and Ford's failure to

act, Defendant A. Smith approached Ms. Diamond several days later on or around May 26, 2020, and coerced her into writing a statement that she did not tell anyone at GDCP about the incident.

108.   Defendant Ford's subordinates also retaliated against Ms. Diamond for filing her PREA complaint against Defendant A. Smith on or about May 29, 2020, by ransacking her cell, confiscating essential items such as food, soap, and property without justification, and partially removing her from her work detail as an orderly. Ms. Diamond, through counsel, sent Defendant Ford and others a Third Notice of Violations on June 3, 2020, notifying them of this incident.

109.   As a consequence of the sexual abuse and staff misconduct that Ms. Diamond experienced at GDCP, Ms. Diamond suffered injury and emotional harm, which aggravated her PTSD.

### Ms. Diamond Experienced Continued Abuse Following Her Transfer to Coastal, Another Men's Prison Where Her Risks of Sexual Assault, Abuse, and Harassment were Known and Obvious

110.   On or about June 3, 2020, after suffering six sexual assaults at GDCP, Ms. Diamond was transferred from GDCP to Coastal, another men's prison within GDC.

111.   Almost immediately upon her arrival at Coastal, Ms. Diamond again became a target for sexual abuse.

112.   During her six months at Coastal, Ms. Diamond has been sexually harassed, abused, and assaulted **eight times** and subjected to pervasive sexual harassment on a daily and relentless basis.

### *Ms. Diamond Was Sexually Harassed in June 2020 by a Unit Manager at Coastal Whose Job It Was to Protect Her*

113.   In June 2020, shortly after her arrival at Coastal, Ms. Diamond was sexually harassed by a GDC Unit Manager, Defendant R. Jackson, in a manner that set the tone for future harm and abuse.

114.   Defendant R. Jackson approached Ms. Diamond on or about June 16, 2020, and made derogatory references to Ms. Diamond's gender and inappropriate comments about her body, including her breasts and genitalia. These actions, which flouted GDC's written policies, *e.g.*, GDC PREA Policy SOP 208.06, conveyed to Ms. Diamond that GDC employees at Coastal would not protect her and would merely facilitate her abuse.

115.   Thereafter, on or about June 17, 2020, Defendant R. Jackson called a dormitory-wide meeting and announced Ms. Diamond's transgender status to everyone in Ms. Diamond's future living quarters, a day before she was slated to move in.

116.    In the meeting, Defendant R. Jackson made crude and derogatory sexual remarks about Ms. Diamond's breasts and genitalia and told everyone gathered that "a freak is about to walk in." Defendant R. Jackson also referred to Ms. Diamond as "he" and "it" and disclosed her private medical information, provoking hostility and singling out Ms. Diamond for further violence.

117.    When Ms. Diamond arrived in the dormitory the following day, she noticed that people were staring at her. Eventually, several people told Ms. Diamond about the dormitory-wide meeting that Defendant R. Jackson had organized the day before and the derogatory statements he had made about her.

118.    Defendant R. Jackson's actions are reflective of a widespread and pervasive pattern by GDC personnel of disregarding the safety needs of incarcerated transgender people in their custody.

119.    By degrading Ms. Diamond and drawing attention to her transgender status in violation of the policies described above, Defendant R. Jackson further jeopardized Ms. Diamond's safety by signaling to others that GDC turned a blind eye to hostile treatment of Ms. Diamond and would not protect her from abuse.

***Ms. Diamond Was Retaliated Against in June 2020 Which Effectively
Discouraged Her from Directly Reporting Further Abuse***

120.   On or about June 19, 2020, two days after his dormitory meeting,
Defendant R. Jackson summoned Ms. Diamond to a dormitory-wide meeting after
she attended a lawyer call. During this gathering, Defendant R. Jackson singled out
Ms. Diamond and bemoaned the presence of transgender people in the dormitory.
Defendant R. Jackson made hostile comments about "snitches" and then proceeded
to explicitly and publicly threaten Ms. Diamond, saying he had "people'' who could
"get at [Ms. Diamond]" if she made any further reports of misconduct. There is video
surveillance of both these dormitory-wide meetings and multiple witnesses were
present at each.

121.   On July 2, 2020, Ms. Diamond, through counsel, sent a Fourth Notice
of Violations that relayed to Defendants Ward, Lewis, J. Jackson, Holt, Toole, Sauls,
Benton, and Atchison the sexual harassment and misconduct Unit Manager Jackson
had engaged in and the ways that his misconduct placed Ms. Diamond at increased
risk of violence and sexual assault.

122.   Defendant Benton made copies of the Notice of Violations despite the
confidential information it contained and distributed it widely, contrary to GDC's

PREA Policy which stated "PREA information is confidential in nature and shall only be released on a need-to-know basis." SOP 208.06 (IV)(B)(1).

123.   As a result of the distribution of the Notice of Violations, Ms. Diamond was pressured and coerced by GDC staff members who felt implicated by her notice letter. These confrontations, together with Defendant R. Jackson's direct threats, made Ms. Diamond fearful of reporting PREA violations directly, or otherwise participating in investigations without counsel present.

124.   Defendant Benton's widespread distribution of Ms. Diamond's PREA notice beyond the intended recipients placed Ms. Diamond at risk of further retaliation and abuse by staff.

### *Ms. Diamond Was Sexually Assaulted and Threatened in July 2020 After Defendants Refused to Take Reasonable Efforts to Protect Her or Secure Her Cell*

125.   On or about July 3, 2020, Ms. Diamond was sexually assaulted again. Ms. Diamond's attacker, a male assailant from another dormitory, was let into Ms. Diamond's dormitory by a GDC officer. Ms. Diamond had been standing with a group of people and eventually turned to go back to her room. Her attacker followed and entered the room behind her. He grabbed her, covered her mouth, started touching her, and ripped off some of her clothes. Two other incarcerated people were able to intervene and stop the attack.

126.   Ms. Diamond reported the July 3rd sexual assault to the Coastal PREA Coordinator and to her Mental Health Counselor, who, pursuant to GDC PREA Policy, notified Defendants Benton and Atchison, as among GDC's "required personnel," about the assault and Ms. Diamond's heightened risk of sexual victimization.

127.   Defendant Benton took no reasonable measures responsive to Ms. Diamond's notification about the assault that would mitigate the ongoing risk she faced. Ms. Diamond, who has seen her attacker at Coastal since the assault, is fearful that he will be allowed into her dormitory again.

128.   On or about July 16, 2020, GDC staff who report to and are supervised by Defendant Benton allowed another unauthorized person to enter Ms. Diamond's cell. Ms. Diamond was sitting in the TV room when she saw a would-be male assailant from another dormitory enter her empty cell and later leave.

129.   She learned that this person told others in her dormitory he was looking for her.

130.   The presence of a potential perpetrator having unfettered access to Ms. Diamond's dormitory occurred because Defendants Toole and Benton recklessly or maliciously placed Ms. Diamond in a cell that does not lock, thus increasing her already bona fide fears of continued sexual assault.

131.   Ms. Diamond had repeatedly complained about her cell and requested repairs to her lock on multiple occasions, including in September 2020 when Lieutenant Goodell dismissed her concerns and simply stated that some doors work, and others do not. Ms. Diamond also spoke to a maintenance worker about the lock and was informed that prison administrators had set specific protocols to prevent her cell from locking.

132.   The fact that Defendant Benton has allowed incarcerated people from other dormitories to repeatedly and improperly enter Ms. Diamond's dormitory increases the already substantial risks to Ms. Diamond's safety and has caused her emotional anguish.

133.   On or about July 20, 2020, Ms. Diamond sent a Fifth Notice of Violations through counsel informing Defendants Ward, Holt, Toole, Sauls, Benton, and Atchison that Ms. Diamond had been sexually assaulted and harassed repeatedly, including on July 3, 2020, and explained that GDC officials were allowing would-be perpetrators into Ms. Diamond's dormitory, increasing her already substantial risk of sexual assault. Ms. Diamond also explained that she had legitimate concerns related to housing and safety and that the assaults and fear of further victimization were adversely impacting her mental health. She requested a safety transfer, including placement in a female facility.

40

### *Ms. Diamond Was Sexually Assaulted and Abused Repeatedly in September 2020*

134.   On or about September 13, 2020, Ms. Diamond woke up during the night and found an unknown man masturbating at the foot of her bed.

135.   Then, over a three-day period in September 2020, Ms. Diamond was sexually assaulted repeatedly by male assailants exploiting the permission slip that had been granted by virtue of Defendants' indifference and inaction to Ms. Diamond's prior attacks.

136.   On or about September 18, 2020, a male assailant locked Ms. Diamond in a room, ripped her shirt off, and proceeded to sexually assault her. He grabbed Ms. Diamond's breasts, pushed her to the bed, and attempted to forcibly rape her. Ms. Diamond only escaped after "count" commenced, and she was able to run away.

137.   Thereafter, on or about September 19, 2020, Ms. Diamond was again sexually assaulted by another incarcerated person who lives in her dormitory. The man entered Ms. Diamond's cell, physically grabbed her head, and forced her to give him oral sex.

138.   On or about September 20, 2020, Ms. Diamond was assaulted by two other men who live in her dormitory. During the first attack, Ms. Diamond was brutally attacked and assaulted in her room. During the second attack, which took

place later that day, Ms. Diamond was attacked after being lured into a different room. Once there, a different male assailant grabbed her breasts, groped her, and sexually assaulted her until she was able to escape.

139.   On September 28, 2020, Ms. Diamond requested to be moved out of her dormitory for fear of further attacks. Ms. Diamond was told that she could not move because Defendant Toole had specified that she is to stay in her current room.

140.   On September 29, 2020, Ms. Diamond sent a Sixth Notice of Violations to GDC through counsel notifying Defendants Ward, Lewis, J. Jackson, Holt, Toole, Sauls, Benton, and Atchison of her need for safe housing. The Sixth Notice of Violations detailed the horrific assaults Ms. Diamond experienced between September 18 and 20, 2020, and reiterated that Ms. Diamond was not safe in GDC's men's prisons given her history of victimization and substantial ongoing risks.

141.   Despite learning about Ms. Diamond's reports of sexual assault and urgent requests for a safety transfer, Ward, Lewis, J. Jackson, Holt, Toole, Benton, and Atchison individually and collectively, decided not to take any corrective measures to ensure Ms. Diamond's safety from the substantial and realized risk of sexual assaults.

### *Ms. Diamond Was Sexually Assaulted Repeatedly in October 2020*

142.   On or about October 9, 2020, after Ms. Diamond took her prescribed Trazodone, a male assailant entered her unlocked cell during the night while she was asleep and fondled her while masturbating.

143.   Because Defendants Toole and Benton had repeatedly demonstrated their unwillingness to protect her, or even to provide her with a working cell door, Ms. Diamond stopped taking her sleep medications for fear that she would be assaulted again while sleeping in the same dormitory as her past assailants, in a cell that will not lock.

144.   On October 23, 2020, Ms. Diamond, through counsel, sent a Seventh Notice of Violations that notified Defendants Ward, Lewis, J. Jackson, Holt, Toole, Sauls, Benton, and Atchison that she had been sexually assaulted again because her cell door did not lock to keep out intruders. The letter also explained that Ms. Diamond's mental health was deteriorating based on their failure to protect her from sexual assaults, abuse, and harassment, and repeated her urgent request for a safety transfer. Ms. Diamond begged to be placed in a transitional center, paroled, or transferred to a female facility to keep her safe from further abuse.

145.   On or about October 29, 2020, Ms. Diamond learned that yet another male assailant had entered her unlocked cell and sexually assaulted her during her

43

sleep. Later that same day, Ms. Diamond was approached by another man in her dorm who aggressively threatened her with sexual assault, stating that he would "stuff [his] cock in [her] throat."

146.   The failures of Defendants Ward, Holt, Toole, and Benton to take reasonable measures to protect Ms. Diamond after notice of sexual assaults and abuse both exacerbated her risk and reflect the widespread and pervasive pattern of GDC personnel disregarding the safety needs of incarcerated transgender women in their custody.

147.   Individually, and in their totality, the sexual assaults Ms. Diamond endured under Defendants' custody have caused her profound and irreparable physical and emotional harm.

148.   On or about October 30, 2020, suffering severe dysphoria as a result of undertreated gender dysphoria, Ms. Diamond attempted to castrate herself and, fearing another imminent sexual assault and distraught that her health and safety needs were still being ignored by GDC, attempted suicide by hanging.

149.   Ms. Diamond's suicide and castration attempt was thwarted by another incarcerated person who entered her unlocked cell, but she continues to struggle with PTSD, caused by her previous sexual assaults in GDC custody, suicidal ideation, self-harm, and impulses to self-castrate.

150.   Ms. Diamond remains at continued risk of sexual victimization to this day, in the same dormitory and facility where she was repeatedly assaulted.

151.   Ms. Diamond also fears a return to GDC, where she was victimized and to which she could be transferred at any time.

## Defendants Have Also Refused Ms. Diamond Medically Necessary Gender Dysphoria Care

152.   In addition to refusing Ms. Diamond protection from sexual assault, Ms. Diamond has also been denied constitutionally mandated gender dysphoria care—deprivations made all the more egregious because they lie at the heart of *Diamond I*. *Diamond I* put GDC on notice of Ms. Diamond's gender dysphoria needs and the severe consequences of not providing her medically necessary care, including depression, suicidality, and self-castration attempts.

153.   Notwithstanding this knowledge and despite the written policy GDC adopted in response, Defendants Ward, Lewis, J. Jackson, and Sauls have refused to provide Ms. Diamond "constitutionally appropriate medical and mental health treatment" for gender dysphoria, consistent with the "[c]urrent, accepted standards of care" since her return to custody. GDC Management & Treatment of Offenders Diagnosed with Gender Dysphoria, SOP 507.04.68(I), (IV) (2015) (hereinafter "Gender Dysphoria Policy").

45

154. Instead of treating Ms. Diamond's gender dysphoria in accordance with the accepted Standards of Care, Defendants Ward, Lewis, J. Jackson, and Sauls have denied her necessary treatments without so much as evaluating her, often vetoing the consensus opinions of GDC clinicians and medical experts without any individualized medical judgment whatsoever.

155. Instead of receiving medically necessary forms of gender dysphoria treatment, Ms. Diamond has received "Sudoku puzzles" to address her mental anguish.

### *Defendants Have Failed to Provide Ms. Diamond Medical Care According to the Accepted Standards of Care for Treating Gender Dysphoria*

156. The accepted Standards of Care for the treatment of gender dysphoria are promulgated by the World Professional Association for Transgender Health ("WPATH"), an international association of physicians and mental health experts who specialize in the diagnosis and treatment of gender dysphoria. *See* World Professional Association for Transgender Health, Standards of Care for the Health of Transsexual, Transgender & Gender-Nonconforming People (7th ed. 2011).

157. The Standards of Care establish that treatment for gender dysphoria consists of the following medical treatments, customized to meet individual needs and provided in a manner sufficient to alleviate a patient's dysphoria symptoms:

46

a.   Changes in gender expression, including through pronoun usage, grooming (including, *e.g.*, hair removal for transgender women), and dress to match one's internal gender;

b.   Receiving hormone therapy to promote the development of secondary sex characteristics that affirm one's gender;

c.   Obtaining gender affirming/confirming treatments and surgical procedures.

158.   The Standards of Care also note that psychotherapy may be useful for exploring gender identity, role, and expression, alleviating internalized transphobia and stigma, and enhancing social and peer support, but not as a substitute for medical treatment such as hormone therapy or gender role changes.

159.   The National Commission on Correctional Healthcare, the U.S. Department of Justice ("Department of Justice"), and the National Institute of Corrections have all endorsed the Standards of Care as the accepted medical standard for the treatment of gender dysphoria in carceral settings.

160.   The Standards of Care recognize that:

a.   Attempting "to cure" a person of gender dysphoria by forcing them to disregard their innate sense of gender identity and live as their assigned gender is dangerous and puts them at substantial risk of serious harm.

b.   Psychotherapy, while recommended to provide affirmation to individuals newly diagnosed with gender dysphoria, is not a substitute for treatments such as hormone therapy or outwardly expressing one's gender identity where medically required.

c.    Attempting to treat gender dysphoria with mental health counseling alone, or in combination with psychotropic drugs, is a gross departure from accepted medical practice that puts individuals with gender dysphoria at a severe risk of physical injury, decompensation, and death.

161.  The Standards of Care also warn that failing to provide transgender people medically necessary treatment for gender dysphoria has dire physiological and psychological effects, including psychological decompensation, including anxiety and depression; suicide; and self-castration attempts (*i.e.*, binding or removing the testicles), a severe side effect of gender dysphoria that only manifests when necessary treatments are denied.

162.  Every major medical association in the United States—including the American College of Obstetricians and Gynecologists, the Endocrine Society, the American Medical Association, and the American Psychological Association, among others—recognize the Standards of Care as the authoritative clinical standard for the treatment of gender dysphoria.

163.  If healthcare providers do not provide treatment that ensures that the patient is supported in their gender identity and expression, the consequences can be severe and can lead to serious health consequences including depression, anxiety, hopelessness, castration attempts as a form of self-treatment, self-harm, suicidal ideation, suicide attempts, and completed suicides.

164.   Because gender dysphoria is a serious, but treatable, medical condition, appropriate treatment effectively attenuates the symptoms.

165.   Failure to provide treatment in accordance with the Standards of Care require a medical provider to reassess a patient's care regimen and provide additional forms of treatment if dysphoria symptoms such as self-castration attempts persist, because these symptoms are unique to untreated or inadequately treated cases of gender dysphoria.

### *Defendants Have Denied Ms. Diamond Medically Necessary Care and Ignored the Treatment Recommendations of Gender Dysphoria Experts and GDC Clinicians*

166.   Consistent with the Standards of Care, the medically necessary treatment for Ms. Diamond's gender dysphoria is regular hormone therapy, consisting of estrogen treatments and anti-androgen medications, and accommodations that allow her to express her female gender identity.

167.   Consistent access to hormone therapy beginning in her late teens prevented Ms. Diamond from developing facial hair prior to her first period of incarceration. GDC's failure to provide Ms. Diamond with hormone therapy during the three years of her incarceration, from 2012 to 2015, forced her body to undergo dramatic alterations and led to Ms. Diamond developing unwanted facial hair for the

first time. Consequently, Ms. Diamond now requires access to body and facial hair removal treatment such as electrolysis, laser hair removal, or medicated creams.

168.   When Ms. Diamond is denied medically necessary gender dysphoria care, she experiences symptoms such as severe depression, anxiety, suicidal ideation, self-harm, and self-castration attempts as a form of self-treatment. When Ms. Diamond receives adequate gender dysphoria treatment, her well-being improves, her symptoms such as self-castration attempts completely abate, and other symptoms are significantly reduced.

169.   GDC officials, including Defendants Lewis, J. Jackson, and Sauls, knew about Ms. Diamond's treatment needs because of *Diamond I*, Ms. Diamond's medical and mental health records, gender dysphoria experts, and Ms. Diamond's treating clinicians within GDC.

170.   In 2015, Dr. Sloan, Ms. Diamond's treating provider at GDC, concluded that adequate care for Ms. Diamond must include hormone therapy and "gender role change" (*i.e.*, female gender expression). Without this treatment, Dr. Sloan warned, Ms. Diamond is at an increased risk of self-harm.

171.   Dr. Randi Ettner, who served as an outside expert in *Diamond I*, also concluded after a three-hour clinical assessment of Ms. Diamond in 2015 that Ms. Diamond required hormone therapy and accommodations for her gender

50

expression. GDC's failure to provide treatment, specifically hormone therapy and gender expression, Dr. Ettner noted, "rekindled the gender dysphoria that she had successfully managed for nearly two decades," and caused Ms. Diamond to experience suicidal ideation and attempt suicide and self-castration. Declaration of Dr. Randi C. Ettner at ¶ 52, *Diamond I*, No. 5:15-cv-50 (M.D. Ga. Feb. 20, 2015), ECF No. 2-1.

172.   Dr. Ettner specified that accommodations for Ms. Diamond's gender expression, including being allowed clothing, grooming, and hairstyle modifications that permit her to outwardly express her gender, are "[i]ntegral to successful treatment of gender dysphoria." *Id*. at ¶ 70.

173.   None of the clinicians who have evaluated and treated Ms. Diamond since her re-entry into GDC custody have disputed Dr. Sloan and Dr. Ettner's consensus that the appropriate treatment for Ms. Diamond is hormone therapy and accommodations for her gender expression.

174.   Since Ms. Diamond's re-entry in 2019, GDC psychiatrist Dr. David Roth has recommended that Ms. Diamond receive a treatment plan providing her with accommodations related to her gender expression. During a July 2020 evaluation, Dr. Roth also noted Ms. Diamond's complaints about not being able to

regularly shave and to receive consistent doses of hormone therapy, which are necessary to her well-being.

175.   Dr. Daniel Fass, a GDC psychologist who also evaluated Ms. Diamond, has also advocated for Ms. Diamond to receive accommodations related to her gender expression and contacted Defendants Lewis and J. Jackson to alert them to the fact that GDC's existing approach to care was inadequate.

176.   However, the medical consensus and treatment recommendations of Ms. Diamond's clinicians within GDC have been summarily overruled by Defendants Lewis, J. Jackson, and Sauls who have never taken the time to individually evaluate Ms. Diamond or her treatment needs.

## Defendants Have an Unconstitutional Custom, Policy, or Practice of Violating the Healthcare Rights of Transgender People in Custody

177.   Instead of exercising independent medical judgment, Defendants Lewis, J. Jackson, and Sauls, together with Defendant Ward, have denied Ms. Diamond care pursuant to the "Hormones-Only Policy"—a policy, practice, or custom which categorically limits the ability of people with gender dysphoria to receive appropriate care.

178.   Pursuant to GDC's Hormones-Only Policy:

     a.     GDC imposes a blanket ban on gender dysphoria treatment beyond hormone therapy or counseling, regardless of need;

b.   Hormone therapy is provided to transgender people who lack outside legal advocates, if at all, only after significant delay;

c.   Hormone therapy, to the extent it is provided, will typically be in doses that are sub-therapeutic due to lack of monitoring, interruption, and delay;

d.   GDC clinicians recommending treatment beyond hormone therapy or counseling are summarily blocked without an individualized assessment of need;

e.   Transgender people are denied allowances for gender expression, subjected to gender-based harassment, and punished by GDC staff for their perceived gender nonconformity;

f.   Transgender people who experience depression, suicidality, inclination to self-harm, or self-castration attempts due to the inadequacy of their gender dysphoria treatment are not evaluated or referred for additional care;

g.   Surgical evaluations and surgical treatment for gender dysphoria are subject to a blanket ban, regardless of need.

179.   Countless transgender women in GDC custody, including Ms. Diamond, are subjected to the Hormones-Only Policy despite Defendants' knowledge from *Diamond I* that blanket restrictions on gender dysphoria care are unconstitutional and create a substantial risk of serious harm.

180.   The Hormones-Only Policy has superseded GDC's written policies on the treatment of gender dysphoria, including the Gender Dysphoria Policy released following *Diamond I* that purports to provide "constitutionally appropriate"

treatment, according to "[c]urrent, accepted standards of care." Gender Dysphoria Policy, SOP 507.04.68 (I), (IV).

181.   Because the Hormones-Only Policy adopted by Defendants Ward, Lewis, J. Jackson, and Sauls bans all treatment beyond hormone therapy, regardless of need, the care offered to Ms. Diamond and others is so minimal that it amounts to no treatment at all. Further, the hormone therapy offered under the policy does not align with the Standards of Care because it is administered inconsistently, unmonitored, and frequently subject to delay.

## Defendants Continue to Refuse Ms. Diamond Gender Dysphoria Treatment Pursuant to a Blanket Policy

182.   Ms. Diamond's hormone treatment has been discontinued for weeks at a time.

183.   Ms. Diamond has not received regular bloodwork or monitoring to ensure the adequacy of her hormone levels. She has had endocrinologist appointments without the requisite blood work for the endocrinologist to adequately monitor her blood levels.

184.   GDC has failed to provide Ms. Diamond with mental health counseling by practitioners minimally competent in treating gender dysphoria to monitor and

evaluate her treatment needs, which, in any event, require more than the provision of Sudoku puzzles.

185.    Dr. Roth's attempts to provide Ms. Diamond a comprehensive plan for gender dysphoria treatment after meeting and evaluating her were rejected by Defendants Lewis and J. Jackson, who, despite never examining Ms. Diamond, must approve treatment plans for people diagnosed with gender dysphoria.

186.    Dr. Fass also informed Ms. Diamond that he could not offer her more treatment beyond hormone therapy because everything was getting "shut down" by Defendant Lewis.

187.    On or about September 10, 2020, Ms. Diamond met with Dr. Roth, Dr. Fass, and other GDC medical providers. They informed Ms. Diamond that their recommendations had been overruled by Defendant Lewis and that they were facing resistance from high-level officials like Defendants Ward, Lewis, and Toole.

188.    Failing to provide Ms. Diamond the medically necessary treatments outlined above grossly deviates from the Standards of Care, which affirm that transgender women like Ms. Diamond require treatment that will alleviate or even cure their gender dysphoria symptoms.

189.    Except for periods where she has been in the custody of GDC, Ms. Diamond has never engaged in self-castration attempts because she has had

access to the medically necessary treatment that manages her severe gender dysphoria.

190.   Ms. Diamond has endured strict and medically harmful restrictions on her gender expression, including threats of forced haircuts and limited access to hair removal.

191.   Ms. Diamond has also been refused treatments to remove her facial hair for weeks at a time, including access to razors or clippers for shaving, exacerbating her gender dysphoria to an intolerable level.

192.   The denials of care began at GDCP and continued at Coastal at the direction of Defendant Lewis and through the actions and omissions of Defendants J. Jackson and Sauls.

193.   Even though Defendants Lewis, J. Jackson, and Sauls each have the authority as well as the obligation to ensure that Ms. Diamond receives minimally adequate care for her gender dysphoria, they have wholly abdicated their job duties and refused to initiate necessary treatment, despite the known and obvious consequences of their actions.

194.   Defendant Lewis has reviewed and personally rejected Ms. Diamond's urgent requests for care, including grievances addressing her unmet treatment needs,

such as access to female commissary items and prescription medication to prevent facial hair growth.

195.   As a foreseeable result of Defendants Lewis, J. Jackson, and Sauls's refusal to provide Ms. Diamond minimally adequate gender dysphoria care, she has experienced severe mental and physical injury, including depression, anxiety, suicidal ideation, and suicide and self-castration attempts.

196.   Ms. Diamond's ongoing suicidality and compulsion to engage in castration and self-harm are symptoms of her unmanaged gender dysphoria that would not be present if she were receiving minimally adequate treatment for her gender dysphoria from GDC.

197.   Ms. Diamond's castration attempts have also caused injuries to her urinary system, and she has experienced severe pain and difficulty urinating for days at a time—conditions which Ms. Diamond was warned put her at risk for kidney failure and possibly death.

198.   Despite her severe symptoms, Ms. Diamond is not receiving adequate treatment for her gender dysphoria to this day.

## Defendants Knew of, but Disregarded, Ms. Diamond's Treatment Needs and the Recommendations of Skilled GDC Clinicians

199.   Defendants Ward, Lewis, J. Jackson, and Sauls have withheld medically necessary gender dysphoria treatment from Ms. Diamond despite being fully aware of her diagnosis, treatment needs, and current and foreseeable risk of harm because of notice they received verbally and in writing, including through her grievances, correspondence, medical records, and *Diamond I.*

200.   Between October 2019 and November 2020, Ms. Diamond filed grievances and grievance appeals that fully exhausted administrative remedies for her claim that Defendants Ward, Lewis, J. Jackson, and Sauls failed to provide her adequate gender dysphoria care. Ms. Diamond's grievances and grievance appeals requested that GDC initiate adequate gender dysphoria care, including access to hair removal options, access to gender affirming commissary items, and regular appointments with medical and mental health providers competent to treat gender dysphoria. Defendants Ford and Lewis personally reviewed Ms. Diamond's grievances or appeals and summarily rejected them.

201.   Ms. Diamond also notified Defendants Ward, Lewis, J. Jackson, and Sauls of her treatment needs through official correspondence. Among the nine Notices of Violations Ms. Diamond, through counsel, sent GDC between May 1,

2020, and November 6, 2020, five notified Defendants Ward, Lewis, J. Jackson, and Sauls of her severe unmet gender dysphoria healthcare needs.

202.  Through Ms. Diamond's First Notice of Violations, dated May 1, 2020, Defendants Ward, Lewis, J. Jackson, and Sauls were informed that she was not receiving adequate treatment for her gender dysphoria, including consistent hormone therapy.

203.  Through Ms. Diamond's Fourth Notice of Violations, dated July 2, 2020, Defendants Ward, Lewis, J. Jackson, and Sauls were informed that she had attempted to castrate herself due to her poorly managed gender dysphoria and had sustained serious injuries.

204.  In follow up correspondence sent July 9, 2020, July 10, 2020, and July 16, 2020, Ms. Diamond notified Defendants Ward, Lewis, J. Jackson, and Sauls, through counsel, that she was experiencing acute medical issues as a result of her self-castration attempts—including severe pain, difficulty urinating, and kidney problems. She requested emergency medical treatment, as well as an opportunity to speak with GDC representatives about her ongoing gender dysphoria treatment needs, but her requests were denied.

205.  Ms. Diamond's Fifth Notice of Violation, dated July 20, 2020, informed Defendants Ward, Lewis, J. Jackson, and Sauls that her mental and

physical health had continued to deteriorate due to gender dysphoria treatment that was grossly inadequate and relayed that GDC clinicians had determined she was at risk for kidney problems and lasting physical injury.

206.  In the Sixth Notice of Violations, dated September 29, 2020, Ms. Diamond notified Defendants Ward, Lewis, J. Jackson, and Sauls, through counsel, that she was still not receiving adequate gender dysphoria care, which had led to rapidly deteriorating mental and physical health, including attempts at self-surgery.

207.  In her Seventh Notice of Violations, dated October 23, 2020, Ms. Diamond notified Defendants Ward, Lewis, J. Jackson, and Sauls, through counsel, that the repeated sexual assaults she was experiencing were exacerbating her post-traumatic stress disorder and that her mental health was continuing to deteriorate.

208.  In her Eighth Notice of Violations, dated November 2, 2020, and sent electronically to GDC general counsel, Ms. Diamond notified Defendants Ward, Lewis, J. Jackson, and Sauls, through counsel, of her suicide attempt.

209.  In her Ninth Notice of Violations, dated November 6, 2020, sent electronically to GDC counsel, Ms. Diamond notified Defendants Ward, Lewis, J. Jackson, and Sauls, through counsel, that Ms. Diamond remained actively suicidal.

210.   In addition, Ms. Diamond repeatedly notified GDC staff, including Defendants Toole and Benton, that her gender dysphoria treatment was inadequate and leading her to have feelings of depression, anxiety, and hopelessness; to have thoughts and to engage in self-harm; and to have suicidal ideations and impulses. Despite having the authority to respond to Ms. Diamond's concerns and direct Coastal personnel to perform additional evaluations and treatment, Defendants Benton and Toole did nothing.

211.   By refusing to provide medically necessary gender dysphoria treatment for Ms. Diamond, Defendants Ward, Lewis, J. Jackson, and Sauls blocked and overruled the recommendations of GDC treating providers and clinicians with specialized knowledge on the treatment of gender dysphoria who, unlike Defendants, personally evaluated Ms. Diamond when it came to determining her needed care.

212.   Defendants Ward, Lewis, J. Jackson, and Sauls's refusal to provide Ms. Diamond anything beyond sub-therapeutic hormone therapy is so wholly inadequate that it is tantamount to no treatment at all. Defendant Lewis's refusal to provide Ms. Diamond medically necessary care in accordance with the Standards of Care is also grossly negligent, if not wanton and malicious, because of her involvement in *Diamond I*.

213.   Defendants Ward, Lewis, J. Jackson, and Sauls's steadfast refusal to provide Ms. Diamond medically and clinically appropriate treatment for her gender dysphoria, including but not limited to gender expression allowances, has caused Ms. Diamond severe physical and emotional injury, including depression, anxiety, suicidal ideation, repeated suicide and self-castration attempts, and attendant injuries, including problems with urination that persist.

214.   Had Ms. Diamond received medically necessary care in accordance with the Standards of Care, she would not have experienced severe gender dysphoria symptoms such as her self-castration attempts.

## Defendants' Failure to Protect Ms. Diamond Shows Callous Indifference to Ms. Diamond's Health and Safety Needs

### Defendants Disregarded the Known Risks Their Housing Decisions Posed to Ms. Diamond's Safety

215.   In addition to being apprised of her health care needs, each of the *Diamond II* Defendants knew that transgender women like Ms. Diamond face a substantial risk of sexual assault in male GDC facilities based on *Diamond I*, the Department of Justice's Statewide Investigation into the abuse of LGBT people in GDC custody, as well as the obviousness of the risk.

216.   Also among the bases for Defendants' knowledge was their familiarity with federal law and GDC's policies on transgender people. GDC's Classification

and Management of Transgender and Intersex Offenders, SOP 220.09 (2019) (hereinafter "Transgender Management Policy"), expressly acknowledges incarcerated transgender people "***are at particularly high risk*** for physical or sexual abuse or harassment." *Id.* 220.09(IV)(D)(1) (emphasis added). The Prison Rape Elimination Act of 2000, 42 U.S.C. § 15601 *et seq.*, and its implementing regulations, 28 C.F.R. § 115 *et seq.* (collectively "PREA" or the "PREA Standards"), which GDC has incorporated into a number of GDC Standard Operating Procedures, including GDC PREA Policy, SOP 208.06, recognize that transgender people face a substantial risk of victimization in prison that necessitates special safeguards. 28 C.F.R. §§ 115.41; 115.42.[2]

---

[2] Pursuant to PREA, GDC personnel were legally mandated to:

    a.    Assess whether Ms. Diamond was transgender or gender nonconforming and document it in their records, 28 C.F.R. § 115.41(d)(7);

    b.    Identify additional risk factors Ms. Diamond faced, including whether she was previously incarcerated, had any disabilities, had "previously experienced sexual victimization," had a "criminal history [that] is exclusively nonviolent" and perceives herself to be vulnerable within the prison environment, 28 C.F.R. § 115.41(d)(1); (4); (5); (8); (9);

217.   The Transgender Management Policy also made Defendants Lewis, J. Jackson, Holt, Toole, and Atchison members of GDC's Statewide Classification Committee in their official roles, and made them "responsible for making case-by-case decisions" about whether transgender people "will be housed in a male or female facility," in consultation with prison wardens like Defendants Ford and Benton. Transgender Management Policy, SOP 220.09 (III)(J). The Policy also

---

      c.     Consider the housing placement of transgender individuals like Ms. Diamond on an individualized basis, 28 C.F.R. § 115.42(b);

      d.     Determine on a case-by-case basis whether placement in a male or female facility would best ensure Ms. Diamond's health and safety, 28 C.F.R. § 115.42(c);

      e.     Give serious consideration to Ms. Diamond's own views regarding safety, 28 C.F.R. § 115.42(e);

      f.     Review Ms. Diamond's housing placements at least twice a year, or when issues arise, and to assess the need for adjustments, 28 C.F.R. § 115.42(d);

      g.     Provide Ms. Diamond "the opportunity to shower separately" from other incarcerated people. 28 C.F.R. § 115.42(f); and

      h.     Perform re-assessments within 30 days of her entry to custody, upon her transfer between facilities, and following every "incident of sexual abuse, or receipt of additional information that bears on [Ms. Diamond's] risk of sexual victimization." 28 C.F.R. § 115.41(f)–(g).

64

instructed Defendants Lewis, J. Jackson, Holt, Toole, Ford, Benton, and Atchison to give "serious consideration" to the transgender person's own views with respect to their safety when formulating housing placements. SOP 220.09 (IV)(B)(8)(g).

### *Defendants Were Informed of Ms. Diamond's Experiences of Sexual Abuse in GDC Custody but Failed to Act*

218.   At all times relevant to this action, Defendants Ward, Lewis, J. Jackson, Holt, Toole, Ford, Benton, and Atchison also had detailed knowledge of Ms. Diamond's history of victimization within GDC men's prisons and the acute risk she faced based on intake records, institutional records, PREA screening tools, correspondence, and direct communications with Ms. Diamond.

219.   During her intake on October 29, 2019, Ms. Diamond met with several GDC officials who knew she was transgender and were familiar with the facts of *Diamond I*, including her history of sexual assault while in GDC custody. These officials included Defendants Toole and Ford. Upon seeing Ms. Diamond, Defendant Toole said, "Well, well, well, the famous Ashley Diamond," specifically acknowledging his awareness of the facts underlying the earlier litigation, *i.e.*, *Diamond I*. Ms. Diamond also spoke with Defendants Toole and Ford about her history of victimization in men's prisons, ongoing vulnerability to sexual assault, and safety concerns.

220.   Ms. Diamond met with Defendant Atchison via videoconference several days later and reiterated her safety concerns. Ms. Diamond asked Defendant Atchison to assign her a placement in a female facility because of her ongoing risk of sexual assault.

221.   GDC personnel classified Ms. Diamond as a PREA Victim following her re-entry using GDC's PREA Classification and Screening instrument and noted that Ms. Diamond was a transgender person with an exclusively non-violent criminal record, as well as a prior victim of sexual assault in prison who still felt vulnerable.

222.   Between May 1, 2020, and November 6, 2020, Ms. Diamond, through **nine** written Notices of Violations, notified Defendants Ward, Lewis, J. Jackson, Holt, Toole, Sauls, Ford, Benton, and Atchison about the serial abuse she has been experiencing because of their actions and decisions.

223.   Three of Ms. Diamond's Notices of Violations—dated May 1, 2020, May 20, 2020, and June 3, 2020—concerned attacks and abuse Ms. Diamond experienced at GDCP. The remaining six Notices of Violations—letters dated July 2, 2020, July 20, 2020, September 29, 2020, and October 23, 2020, and emails dated November 2, 2020, and November 6, 2020—concerned abuse and deprivations Ms. Diamond experienced at Coastal. Ms. Diamond also attached copies of her previous Notices of Violations as enclosures to all of her subsequent Notice letters.

224.   Defendants Ward, Lewis, J. Jackson, Holt, Toole, Sauls, Benton, and Atchison received copies of all of Ms. Diamond's Notices of Violations concerning both GDCP and Coastal. Defendant Atchison received copies of each of Ms. Diamond's Notices of Violation because they were addressed to GDC's PREA Coordinator and/or the PREA Unit. Defendant J. Jackson received copies of all of Ms. Diamond's Notices of Violations because they were forwarded to her due to their subject matter. Finally, Defendant Ford received copies of all of Ms. Diamond's Notices of Violations concerning GDCP.

225.   Notwithstanding this knowledge of ongoing and future risk, Defendants Ward, Lewis, J. Jackson, Holt, Toole, Ford, and Atchison each blocked her urgent safety requests and participated in the decision to exclusively place Ms. Diamond in men's facilities that lacked adequate safeguards to protect her, instead of safe and appropriate female facilities where she met GDC's own placement criteria.

### _Defendants' Refusal to Provide Ms. Diamond a Safety Transfer Flies in the Face of Provider Recommendations_

226.   Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison also refused to follow the housing recommendations of GDC clinicians with specialized

knowledge of Ms. Diamond's health and safety needs, even when they petitioned for Ms. Diamond to be transferred from Coastal to a safer facility.

227.   Dr. David Roth, a psychiatrist at Coastal and one of Ms. Diamond's treating providers, urged Defendants Lewis, J, Jackson, and others to transfer Ms. Diamond away from Coastal because of abuse she was experiencing as a transgender woman and the ongoing risks to her safety and health.

228.   Dr. Roth noted that "although [Ms. Diamond] is making every effort to remain in population, she is chronically stressed, fearful, and anxious [at Coastal], and this setting actively triggers her PTSD."

229.   Dr. Roth identified a number of other placements that would be more suitable for Ms. Diamond, including a GDC transition center or a Supportive Living Unit, because they would be "more therapeutic than general population in a given prison" and safer than the environment at Coastal, and attempted to initiate a transfer.

230.   However, Dr. Roth's housing recommendations and his attempts to initiate a safety transfer were summarily blocked by Defendants Lewis, J. Jackson, and others, who took no further steps to reduce the ongoing serious risks to Ms. Diamond's safety and rejected her repeated requests for an opportunity to speak and identify additional safeguards to protect her from abuse.

## Defendants Have an Unconstitutional Custom, Practice, or Policy of Violating the Safety Rights of Transgender People in Custody

231.   Defendants Ward, Lewis, J. Jackson, Holt, Toole, Ford, Benton, and Atchison's refusal to consider housing Ms. Diamond anywhere besides men's facilities—despite her having the same or similar risk of sexual assault as a cisgender woman would in that setting—was not based on an individualized assessment of Ms. Diamond's safety needs, or pursuant to any legitimate penological purpose.

232.   Instead, the abuses and deprivations that Ms. Diamond has endured are part of GDC's "De Facto Placement Ban," a long-standing custom, policy, or practice that has become GDC's actual policy and practice concerning the housing and placement of transgender people, superseding the Transgender Management Policy, SOP 220.09, and GDC PREA Policy, SOP 208.06.

233.   The De Facto Placement Ban, which was adopted and ratified by Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison and their predecessors, disregards the safety needs of transgender people in GDC custody, and assigns them to facilities based on their birth-assigned sex, regardless of whether such placements are safe and appropriate.

234.   Under the De Facto Placement Ban:

      a.   Transgender women on hormone therapy, despite having similar risks of sexual victimization if housed with men as cisgender

      women, are nonetheless placed in men's prisons based on the sex assigned to them at birth and refused placement in female facilities on a blanket basis, subject to few, if any, exceptions;

    b.    The Statewide Classification Committee, including Defendants Lewis, J. Jackson, Holt, and Atchison, will assign transgender women to men's prisons even when they are eligible for placement in a female facility by GDC's own criteria; and

    c.    Transgender women are placed in men's facilities without regard for the substantial and foreseeable harm they will face in men's prisons, and without reasonable safeguards to reduce their risk of sexual assault, abuse, and harassment.

235.   Countless transgender women in GDC custody, including Ms. Diamond, are subjected to the De Facto Placement Ban as outlined above, despite Defendants' knowledge that the De Facto Placement Ban creates a substantial risk of serious harm.

236.   As a consequence of the De Facto Placement Ban:

    a.    Once placed in a men's prison, transgender women are often, if not always, relentless targets of sexual assault, abuse, and harassment;

    b.    Sexual assaults against transgender women are often committed by incarcerated people affiliated with gangs who threaten to maim or kill their victims if they report the assaults, placing transgender women at substantial risk of harm or death whether or not they report the abuse;

    c.    No reasonable measures are undertaken to respond to or mitigate the risks transgender women in men's prisons face;

   d.   PREA notices filed by transgender women rarely result in safer placements, other than the inhumane practice of placing them in solitary confinement, if such safer housing exists within men's facilities; and

   e.   Credible allegations of sexual assault, abuse, and harassment are not met with a meaningful institutional response, other than unlawful and prolonged placement in involuntary segregation, or transfer to another male facility that poses substantially similar dangers.

237.   Application of the De Facto Placement Ban means that, for most transgender women, there is no escaping constant sexual harassment, abuse, and assault, threats of sexual assaults, and repeated sexual victimization while in GDC custody.

238.   The transfer of transgender women to other men's facilities to respond to safety risks simply restarts the cycle of sexual assaults and victimization.

239.   Due to the De Facto Placement Ban, instead of taking reasonable steps to protect transgender people from sexual assault or coercion, GDC staff often disregard their safety concerns, blame them for provoking their sexual assaults, and refuse to process their sexual assault grievances due to animus because they are transgender.

240.   In recent years, GDC—including Defendants Ward and Lewis—have been confronted with a U.S. Department of Justice investigation concerning

systemic constitutional violations, as well as numerous complaints and lawsuits by incarcerated people concerning the failures of GDC staff to protect them from assault.

241.   However, staff training regarding the safety needs of transgender inmates with respect to sexual assault remains perfunctory or non-existent, and placement decisions are made pursuant to the De Facto Placement Ban with willful disregard of the substantial risk of sexual assault transgender women endure.

## Defendants Failed to Protect Ms. Diamond Despite Having Ample Notice of Her Ongoing Abuse and Attacks

242.   Defendants Ward, Lewis, J. Jackson, Holt, Toole, Ford, Benton, and Atchison, individually and collectively, also failed to take action to reasonably safeguard Ms. Diamond despite having knowledge that she has continued to face abuse and attacks from her initial placement at GDCP to present.

243.   Instead, Defendants Ward, Lewis, J. Jackson, Holt, Toole, Ford, Benton, and Atchison wiped their hands clean of trying to protect Ms. Diamond and continued a GDC custom, practice, or policy of forcing transgender women into men's prisons to literally fend for themselves.

244.   As a foreseeable result of Defendants Ward, Lewis, J. Jackson, Holt, Toole, Ford, Benton, and Atchison's actions and placement decisions, Ms. Diamond

has been sexually assaulted **fourteen times** since her October 2019 return to custody.

245.   As previously described, between May 1, 2020, and November 6, 2020, Ms. Diamond notified Defendants Ward, Lewis, J. Jackson, Holt, Toole, Sauls, Ford, Benton, and Atchison of her experiences of abuse and assault through **nine** written Notices of Violations.

246.   Because Ms. Diamond attached copies of her previous Notices of Violations as enclosures to all of her subsequent Notice letters, all Defendants were informed of previous incidents, except that Defendant Ford was informed of all incidents that occurred at GDCP. Defendant J. Jackson received all Notices when they were forwarded to her in her role as Director of Mental Health.

247.   On October 31, 2020, via telephone, Ms. Diamond notified Defendants Ward, Lewis, J. Jackson, Holt, Toole, Sauls, Benton, and Atchison, through counsel, that she had suffered another attack during the night because her cell door does not lock properly and that she had become deeply suicidal.

248.   Ms. Diamond also repeatedly informed Defendant Benton and his direct reports at Coastal that her cell door did not lock, making her even more vulnerable to attacks and intruders. Ms. Diamond also requested repairs to her cell

door on multiple occasions, including in June 2020, when she first arrived at Coastal, and in September 2020.

249.   Defendant Benton's direct reports and employees at Coastal dismissed her concerns, at one point stating simply that some cell doors work, and others do not. Ms. Diamond was also informed that Defendants Toole and Benton had set specific protocols for her cell to prevent the door from locking as it ordinarily should.

250.   Ms. Diamond also discussed her history of assaults and ongoing safety concerns with mental health, medical, and PREA personnel who had a mandatory duty to forward her reports to Defendants Lewis, J. Jackson, Holt, Toole, Ford, Benton, and Atchison. She also spoke to Defendants Toole, Ford, and Benton on multiple occasions about her safety and medical needs.

251.   Defendants Ford and Atchison were notified about the sexual assault that formed the basis of Ms. Diamond's March 13, 2020 PREA complaint pursuant to GDC Policy requiring the notification of "all required personnel" upon receipt of a PREA report.

252.   Ms. Diamond also repeatedly voiced her willingness to participate in any internal PREA investigations that GDC wished to conduct but only requested that her lawyers be present because of her bona fide concerns about retaliation.

74

253.  Three of the perpetrators of her abuse and harassment—Nurse Lucas and Defendants A. Smith and R. Jackson—were GDC officers who coerced, threatened, or continued to have contact with Ms. Diamond after she reported their misconduct. Defendant Benton also distributed copies of Ms. Diamond's confidential PREA allegations without regard to her privacy or safety, further jeopardizing her well-being. These actions, among others, indicate a widespread and pervasive pattern of failing to protect transgender women housed in men's prisons from sexual assault, abuse, and harassment and a failure to supervise or train staff.

254.  Ms. Diamond also filed a grievance regarding her history of victimization in GDC and ongoing safety concerns and requested placement in a women's facility. In response, Ms. Diamond was informed that sexual abuse and safety transfers are "non-grievable" issues under GDC's Grievance Policy, so there was no administrative remedy available for Ms. Diamond to pursue or appeal.

255.  Sexual abuse, harassment, and safety transfer requests are non-grievable issues under GDC's Grievance Policy, which means they are exempt from GDC's grievance requirement and administrative remedies are unavailable. GDC Statewide Grievance Procedure, SOP 227.02(IV)(B)(2)(f); (i) (2019) (hereinafter "Grievance Policy").

256.   Despite having incontrovertible knowledge of Ms. Diamond's ongoing assaults in custody, Defendants Ward, Lewis, J. Jackson, Holt, Toole, Ford, Benton, and Atchison have refused to take steps to reasonably safeguard her from continued attacks despite knowing that she remained at risk.

257.   Because of her repeated assaults at Coastal, Ms. Diamond has repeatedly requested safety transfers and additional forms of protection. However, Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison have blocked, refused, and denied all of Ms. Diamond's safety requests. They have also refused to reassess Ms. Diamond's housing placements in light of her assaults or adopt any additional safety measures to protect her. As a proximate cause of Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison's actions, Ms. Diamond has been sexually assaulted and abused **fourteen times** since her return to custody.

258.   Defendant Benton has also failed to take simple and obvious steps to protect Ms. Diamond from sexual assault since her June 3, 2020 transfer to Coastal to present, despite knowing her victimization history and ongoing risks. For instance, Defendant Benton failed to provide Ms. Diamond a cell that locked to prevent nighttime intruders, failed to examine video security footage of her assaults, failed to ensure that his subordinates were properly trained about sexual assault prevention and PREA, and failed to put measures in place to ensure that transgender women

like Ms. Diamond were reasonably protected from sexual abuse at the hands of men at the facility. Defendant Benton has even refused Ms. Diamond's repeated requests to be moved out of the dormitory where she was assaulted to avoid further attacks.

259.   As a result of Defendants Ward, Lewis, J. Jackson, Holt, Toole, Benton, and Atchison's actions and inactions in denying Ms. Diamond a safety transfer or other reasonable protection measures, Ms. Diamond has been assaulted at Coastal **_eight_** times in six months.

260.   To date, Defendants Ward, Lewis, J. Jackson, Holt, Toole, Atchison, and Benton have not taken **_any_** reasonable steps to protect Ms. Diamond from sexual violence at Coastal or address the persistent risks to her safety.

261.   Due to Defendants Ward, Lewis, J. Jackson, Holt, Toole, Atchison, and Benton's actions and omissions, Ms. Diamond remains to this day in a facility and dormitory where she has been repeatedly assaulted, alongside past assailants, continually living in fear of the next, inevitable sexual assault she will have to endure.

## CLAIMS FOR RELIEF

## COUNT I

### Eighth Amendment Violation Under 42 U.S.C. § 1983—Failure to Protect

***For Declaratory and Injunctive Relief Against Defendants Ward, Lewis, J. Jackson, Holt, Toole, Benton, and Atchison***

***For Damages Against Defendants Ward, Lewis, J. Jackson, Holt, Toole, Ford, Benton, Atchison, L. Smith, and R. Jackson***

262.   Ms. Diamond incorporates and realleges herein the foregoing paragraphs and asserts the following for all times relevant to this action:

263.   The Eighth Amendment to the U.S. Constitution prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. Included in the prohibition against cruel and unusual punishment is the right to be free from a known and substantial risk of serious harm, including sexual assault, while in the custody of the State.

264.   Each and every Defendant knew that Ms. Diamond faced a substantial risk of serious harm from sexual assault in GDC custody while housed in men's prisons. Defendants also knew the risks to Ms. Diamond were ongoing because she repeatedly experienced abuse and attacks following her October 2019 return to custody.

265.   Due to the severity and obviousness of the sexual assault risks facing transgender people like Ms. Diamond in GDC custody, PREA and GDC's own

written policies required that GDC officials carefully consider the housing placements of transgender people and take steps to mitigate their risk of sexual victimization, up to and including placement in a female facility.

266.   Contrary to the Eighth Amendment and contemporary standards of decency, Defendants Ward, Lewis, J. Jackson, Holt, Toole, Ford, Benton, Atchison, L. Smith, and R. Jackson showed deliberate indifference to Ms. Diamond's known and substantial risks of sexual assault by failing to take reasonable steps to protect her, despite having the authority to do so, even as she pleaded for safekeeping.

267.   Each of the aforementioned Defendants directly participated in the Eighth Amendment violations alleged while acting under color of state law.

268.   Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison showed deliberate indifference to Ms. Diamond's substantial risk of serious harm by, *inter alia*, participating in or ratifying the decision to exclusively place Ms. Diamond in male GDC facilities where she stood a heightened risk of sexual assault, even though there were female facilities that were a safe and appropriate alternative; failing to take reasonable steps to protect Ms. Diamond from sexual assault at the men's facilities where she was placed; and failing to take action or authorize safety transfers after receiving numerous reports that Ms. Diamond had been repeatedly sexually abused and assaulted as a result of their housing decisions.

79

269. Defendants Ford and Benton were deliberately indifferent to Ms. Diamond's substantial risk of serious harm from sexual assault by, *inter alia*, participating in the decision to house Ms. Diamond exclusively at men's prisons; failing to take reasonable measures to protect Ms. Diamond at their facilities, including denying Ms. Diamond access to a cell that locked to prevent intruders in the case of Defendant Benton; and failing to reasonably respond to the sexual abuse and harassment Ms. Diamond experienced at their respective facilities, including at the hands of their subordinates such as Defendants A. Smith, R. Jackson, and Nurse Lucas.

270. Defendant L. Smith showed deliberate indifference to Ms. Diamond's substantial risk of serious harm by, *inter alia*, failing to take reasonable steps to protect Ms. Diamond from assault at GDCP or to respond to her experiences of sexual assault at the facility despite being GDCP's PREA Compliance Manager, and denigrating Ms. Diamond for being transgender in a manner that further endangered her.

271. Defendant R. Jackson showed deliberate indifference to Ms. Diamond's substantial risk of serious harm by failing to protect her from sexual assault; disclosing confidential PREA information concerning her transgender status in a manner intended to denigrate and arouse the anger of Ms. Diamond's fellow

incarcerated people; and by sexually harassing, denigrating, and demeaning Ms. Diamond for being transgender in a manner intended to, and that did, increase her already substantial risk of sexual assault at Coastal.

272. As a direct, proximate, and foreseeable consequence of Defendants Ward, Lewis, J. Jackson, Holt, Toole, Ford, Benton, Atchison, L. Smith, and R. Jackson's deliberate indifference, Ms. Diamond has been sexually assaulted and abused repeatedly. She also continues to face a substantial risk of assault and remains in constant fear for her safety.

273. Defendants' actions and omissions have caused Ms. Diamond irreparable physical injury and emotional harm, including worsening PTSD and suicidal ideation and suicide attempts.

274. Ms. Diamond seeks damages against Defendants Ward, Lewis, J. Jackson, Holt, Toole, Ford, Benton, Atchison, L. Smith, and R. Jackson in their individual capacities.

275. Ms. Diamond also seeks injunctive and declaratory relief against Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Benton in their official capacities because their flagrant constitutional violations will continue indefinitely, absent injunctive relief.

## COUNT II

### Eighth Amendment Violation Under 42 U.S.C. § 1983—Sexual Abuse

#### *For Damages Against Defendant Aretha Smith*

276.   Ms. Diamond incorporates and realleges herein the foregoing paragraphs and asserts the following for all times relevant to this action:

277.   The Eighth Amendment to the U.S. Constitution prohibits cruel and unusual punishment. Included in the prohibition against cruel and unusual punishment is sexual assault and abuse by corrections staff.

278.   The Eighth Amendment also protects human dignity and therefore prohibits sexual abuse and harassment as conduct lacking any penological justification.

279.   Defendant A. Smith, acting under color of state law, purposefully and knowingly used unjustifiable physical and coercive force in locking Ms. Diamond in a room on two occasions and engaging in sexual abuse, harassment, and/or misconduct over the course of several hours.

280.   Defendant A. Smith's actions lacked any legitimate penological purpose and were not taken in a good-faith effort to maintain or restore discipline.

281.   Instead, Defendant A. Smith's actions, which were severe, sadistic, and repeated, were taken in order to sexually abuse Ms. Diamond and to sexually arouse herself.

282.   The sexual abuse committed by Defendant A. Smith against Ms. Diamond is objectively serious and deeply offensive to human dignity.

283.   Defendant A. Smith's actions violate the contemporary standards of decency that mark the progress of a maturing society and were not, and could not have been, part of the penalty Ms. Diamond is required to pay for her offense.

284.   As a direct and proximate result of Defendant A. Smith's sexual abuse and misconduct, Ms. Diamond suffered irreparable emotional harm.

285.   Ms. Diamond is entitled to damages from Defendant A. Smith in her individual capacity.

## COUNT III

### Eighth Amendment Violation Under 42 U.S.C. § 1983—Policy, Pattern, or Custom

***For Declaratory and Injunctive Relief Against Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison***

286.   Ms. Diamond incorporates and realleges herein the foregoing paragraphs and asserts the following for all times relevant to this action:

287.    Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison knew that transgender women, including Ms. Diamond, are an identifiable group of incarcerated people who are frequently singled out for violent attack and/or sexual assault, abuse, and harassment when housed in men's maximum and medium-security facilities.

288.    Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison denied Ms. Diamond and other transgender women safe housing in women's facilities pursuant to the De Facto Placement Ban, which denies transgender women placement in female facilities with little to no exception, regardless of their individual circumstances and risks.

289.    Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison and their predecessors adopted, ratified, and enforced the De Facto Placement Ban within GDC, despite knowing that it created a substantial risk of serious harm for transgender women like Ms. Diamond.

290.    By applying the De Facto Placement Ban to Ms. Diamond, Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison placed her in a series of men's prisons without regard to her heightened risk of vulnerability and without taking reasonable and adequate actions to reduce the foreseeable risk of sexual assault.

291.   By applying the De Facto Placement Ban to Ms. Diamond, Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison refused to meaningfully consider housing placement and safety transfer requests or to transfer Ms. Diamond and other transgender women to women's facilities even after notice of credible allegations of sexual assaults, threats, and foreseeable future risk.

292.   The De Facto Placement Ban that Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison adopted and applied to Ms. Diamond displaces individualized risk assessments and judgment, supersedes other policies on the management, placement, and treatment of incarcerated transgender people, and has acquired the force of law.

293.   By establishing, maintaining, and/or otherwise applying their De Facto Placement Ban to Ms. Diamond and other transgender women, Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison showed deliberate indifference to the substantial risk of serious harm these practices caused.

294.   There is no penological basis to apply the De Facto Placement Ban to deny Ms. Diamond a transfer to a female facility, or to refuse to provide her with a non-segregated housing placement that adequately protects her from the heightened risk of sexual assault she faces as a transgender woman in men's prisons.

295.   As a direct and proximate result of the De Facto Placement Ban that Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison ratified and applied to Ms. Diamond while acting under color of state law, Ms. Diamond has suffered and continues to suffer irreparable physical injury and emotional harm and will continue to be harmed absent prospective injunctive relief to abate the constitutional violation described herein.

296.   Ms. Diamond seeks injunctive and declaratory relief against Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison in their official capacities to prevent the continued violation of her Eighth Amendment right to be free from cruel and unusual punishment.

## COUNT IV

## Fourteenth Amendment Equal Protection Violation Under 42 U.S.C. § 1983

### For Declaratory and Injunctive Relief Against Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison

297.   Ms. Diamond incorporates and realleges herein the foregoing paragraphs and asserts the following for all times relevant to this action:

298.   The Fourteenth Amendment's Equal Protection Clause provides: "No state shall make or enforce any law which shall abridge the privileges or immunities

of citizens of the United States . . . nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

299.   Under the Equal Protection Clause of the Fourteenth Amendment, discrimination against transgender people is a form of sex discrimination that is presumptively unconstitutional and subject to heightened scrutiny.

300.   Discrimination based on sex includes, but is not limited to, discrimination based on gender, gender nonconformity, transgender status, gender expression, and gender transition.

301.   Discrimination based on transgender status is also presumptively unconstitutional under the Equal Protection Clause and subject to strict, or at least heightened, scrutiny.

302.   Transgender people have suffered a long history of extreme discrimination in Georgia and across the country, in prisons and outside of prisons, and continue to suffer such discrimination to this day.

303.   Many, if not most, transgender and cisgender women who are incarcerated, including Ms. Diamond, have discernable feminine characteristics and secondary female-typical sex characteristics that place them at heightened risk of sexual assault if placed in men's prisons without adequate safeguards.

304.   Both transgender and cisgender women face substantially similar risks of sexual victimization if housed in men's prisons without adequate safeguards.

305.   Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison knew that Ms. Diamond faced a substantially similar risk of sexual assault when housed in men's prisons as a cisgender woman would face in men's prisons.

306.   Disregarding these known safety risks, Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison refused to place Ms. Diamond in a female facility, or similarly safe facility designed to protect her from the sexual victimization of incarcerated men.

307.   Defendants' actions and inactions in placing and keeping Ms. Diamond in men's prisons discriminates against her on the basis of sex.

308.   Defendants' actions and inactions in placing and keeping Ms. Diamond in men's prisons also discriminates against her based on sex stereotyping, namely, treating her as though she were a cisgender man based on the presumption that her gender identity and expression should align with her sex assigned at birth, and housing her in accordance with that perception. This sex stereotyping is based solely on Ms. Diamond's sex assigned at birth, disregarding her gender identity even though she is a woman and has had medical treatment to bring her body into alignment with her female gender identity.

309.   Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison, acting under color of state law, intentionally discriminated against Ms. Diamond by placing her, and continuing to house her, exclusively in men's prisons without adequate safeguards, even though she faces similar risks as all other women in GDC custody.

310.   Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison's actions as described herein were taken without an important or legitimate governmental interest or rational reason, and they had no penological basis to deny Ms. Diamond a safe and appropriate placement in a female facility, based on her sex, gender identity, characteristics, risk factors, and her history of sexual assault in male GDC facilities.

311.   As a direct and proximate result of Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison's actions, Ms. Diamond has suffered and continues to suffer irreparable physical injury and emotional harm and will continue to be harmed absent prospective injunctive relief to abate the constitutional violation described herein.

312.   Ms. Diamond seeks injunctive and declaratory relief against Defendants Ward, Holt, Lewis, J. Jackson, Toole, and Atchison in their official capacities to prevent the continued violation of her Fourteenth Amendment right to equal protection under Law.

## COUNT V

## Equal Protection Under 42 U.S.C. § 1983—Policy, Practice, or Custom

### *For Declaratory and Injunctive Relief Against Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison*

313.   Ms. Diamond   incorporates   and   realleges   herein   the   foregoing paragraphs and asserts the following for all times relevant to this action:

314.   Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison discriminated against Ms. Diamond and other transgender women by adopting and applying a De Facto Placement Ban that denies transgender women safe and appropriate housing placements based on their sex, transgender identity, and impermissible sex stereotypes without a compelling, important, or legitimate governmental interest.

315.   By establishing, maintaining, and applying the De Facto Placement Ban, Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison intentionally discriminated against Ms. Diamond and similarly situated transgender women in GDC custody on the basis of sex while acting under color of state law.

316.   By establishing, maintaining, and applying the De Facto Placement Ban, Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison intentionally

discriminated against Ms. Diamond and similarly situated transgender women in GDC custody on the basis of transgender status while acting under color of state law.

317.   As a direct and proximate result of Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison's application of the De Facto Placement Ban, Ms. Diamond has suffered and continues to suffer irreparable physical injury and emotional harm and will continue to be harmed absent prospective injunctive relief to abate the constitutional violation described herein.

318. Ms. Diamond seeks injunctive and declaratory relief against Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison in their official capacities to prevent their enforcement of the De Facto Placement Ban and the continued violation of her Fourteenth Amendment right to Equal Protection under Law.

## COUNT VI

## Eighth Amendment Under 42 U.S.C. § 1983—Failure to Provide Medical Care

### *For Damages and Declaratory and Injunctive Relief Against Defendants Lewis, J. Jackson, and Sauls*

319. Ms. Diamond incorporates and realleges herein the foregoing paragraphs and asserts the following for all times relevant to this action:

91

320.   Included in the prohibition against cruel and unusual punishment protected by the Eighth Amendment to the U.S. Constitution is the provision of adequate treatment for a serious medical need while in the custody of the State.

321.   Defendants Lewis, J. Jackson, and Sauls knew that Ms. Diamond has gender dysphoria, a serious medical need requiring treatment to avert a serious risk of physical and psychological harm. Defendants also knew that the medically accepted standards for the treatment of gender dysphoria are the Standards of Care.

322.   Defendants Lewis, J. Jackson, and Sauls knew from Ms. Diamond's medical records and the consensus recommendations of the healthcare professionals who actually examined her that the medically necessary treatments for Ms. Diamond's gender dysphoria are hormone therapy in uninterrupted and therapeutic doses, accommodations related to her gender expression (including female undergarments, commissary items, and grooming allowances), and hair removal treatments. They also knew Ms. Diamond required ongoing care and evaluations from mental health professionals qualified to treat gender dysphoria.

323.   Defendants Lewis, J. Jackson, and Sauls knew that the Standards of Care require that gender dysphoria treatment be administered in a manner sufficient to alleviate severe symptoms, which in the case of Ms. Diamond include severe depression, suicidality, self-harm, and self-castration attempts.

324.   Despite this knowledge and Ms. Diamond's repeated requests for care, Defendants Lewis, J. Jackson, and Sauls refused to provide Ms. Diamond medically necessary treatment in deliberate indifference to her serious risk of harm, while acting under color of state law.

325.   Instead, Defendants Lewis, J. Jackson, and Sauls provided Ms. Diamond care that was so poor, cursory, grossly inadequate, and out of step with accepted professional norms that it constitutes a wanton infliction of pain, not medical treatment at all—placing Ms. Diamond at serious risk of harm and death from attempted self-castration and suicide.

326.   By failing to provide Ms. Diamond with treatment sufficient to alleviate her symptoms, Defendants Lewis, J. Jackson, and Sauls failed to provide the minimally adequate care required to be provided to incarcerated transgender people.

327.   The actions and omissions of Defendants Lewis, J. Jackson, and Sauls as described herein were made without the exercise of any individualized medical judgment whatsoever—based on the decision to take an easier but less efficacious course of treatment—and were so cursory and inadequate that they amount to no treatment at all.

328.   Defendant Lewis's actions were also wanton and malicious as they reflect a pattern of denying medically necessary care to people with gender dysphoria that began in *Diamond I* when she also served as Statewide Medical Director.

329.   As a direct and proximate result of Defendants Lewis, J. Jackson, and Sauls's actions and omissions, Ms. Diamond has suffered physical injury and emotional harm.

330.   Ms. Diamond seeks injunctive and declaratory relief against Defendants Lewis, J. Jackson, and Sauls in their official capacities to prevent the continued violation of her Eighth Amendment right to be free from cruel and unusual punishment.

331.   Ms. Diamond's physical and emotional suffering will continue absent injunctive relief to abate Defendants' constitutional violations described herein.

332.   Ms. Diamond also seeks damages from Defendants Lewis, J. Jackson, and Sauls in their individual capacities.

## COUNT VI

## Eighth Amendment Under 42 U.S.C. § 1983—Policy, Custom, or Practice

### For Declaratory and Injunctive Relief Against Defendants Ward, Lewis, J. Jackson, and Sauls

333. Ms. Diamond incorporates and realleges herein the foregoing paragraphs and asserts the following for all times relevant to this action:

334. GDC, through Defendants Ward, Lewis, J. Jackson, and Sauls, has adopted a practice, custom, or policy—the Hormones-Only Policy—limiting the gender dysphoria treatment available to incarcerated transgender people on a blanket basis, regardless of medical necessity.

335. Defendants Ward, Lewis, J. Jackson, and Sauls collectively adopted, ratified, and/or enforce the Hormones-Only Policy within GDC, despite knowing that it creates a substantial risk of suicide and serious self-harm for transgender women like Ms. Diamond, whose gender dysphoria is not adequately treated by hormone therapy alone.

336. The Hormones-Only Policy adopted by Defendants Ward, Lewis, J. Jackson, and Sauls supersedes GDC's written policies on the management and treatment of gender dysphoria and has acquired the force of law. Defendants have also failed to properly train their staff concerning the medical needs of incarcerated

people with gender dysphoria, despite knowing that application of the custom, practice, and policy outlined above would harm patients suffering from gender dysphoria and that harm was likely to continue absent training.

337.   The Hormones-Only Policy adopted by Defendants Ward, Lewis, J. Jackson, and Sauls falls below the minimum accepted Standards of Care and the overwhelming medical consensus that gender dysphoria treatment must be individualized and that medically necessary care requires treatment sufficient to alleviate symptoms such as depression, suicidality, and attempted self-castration.

338.   The Hormones-Only Policy adopted by Defendants Ward, Lewis, J. Jackson, and Sauls only supplies care that is grossly inadequate; is based on decisions to take an easier but less efficacious course of treatment; and is care so cursory as to amount to no treatment at all.

339.   Defendants Lewis, J. Jackson, and Sauls knew that their refusal to authorize anything beyond the provision of hormone therapy to Ms. Diamond was tantamount to a denial of minimally adequate care because of Ms. Diamond's suicidality and repeated attempts to engage in self-castration.

340.   As a direct and proximate result of Defendants Ward, Lewis, J. Jackson, and Sauls's adoption and enforcement of the Hormones-Only Policy, Ms. Diamond has suffered and continues to suffer irreparable physical injury and emotional harm

and will continue to be harmed absent prospective injunctive relief to abate the constitutional violation described herein.

341.  Ms. Diamond seeks injunctive and declaratory relief against Defendants Ward, Lewis, J. Jackson, and Sauls in their official capacities to prevent the continued violation of her Eighth Amendment right to be free from cruel and unusual punishment.

## COUNT VII

### 42 U.S.C. § 1983—Failure to Train and Supervise

#### *For Declaratory and Injunctive Relief and Damages Against Defendants Ward, Lewis, J. Jackson, Sauls, Ford, and Benton*

342.  Ms. Diamond incorporates and realleges herein the foregoing paragraphs and asserts the following for all times relevant to this action:

343.  Defendant Ward, who is a final policy and decision-maker for GDC, failed to properly train his staff on the safety needs of incarcerated transgender people and incarcerated people with gender dysphoria or the measures required to be taken to protect them from sexual assault, abuse, and harassment, despite knowing of a widespread and pervasive pattern of GDC personnel disregarding the rampant sexual victimization experienced by transgender women in GDC custody,

that was likely to continue absent training, and GDC's own written policies concerning the healthcare and safety needs of transgender people.

344.   As a direct and proximate result of Defendant Ward's failure to train his staff as described above, Ms. Diamond was sexually assaulted, abused, and harassed multiple times, by guards and incarcerated men, and denied medically necessary treatment.

345.   Defendant Benton, who has final decision-making authority and responsibility for the training and supervision of all Coastal personnel, failed to train and supervise his staff despite knowing of a widespread and pervasive pattern of Coastal personnel disregarding the rampant sexual victimization experienced by transgender women at Coastal, that was likely to continue absent training, and GDC's own written policies concerning the safety needs of transgender people.

346.   As a direct and proximate result of Defendant Benton's failure to train and supervise his staff as described above, including but not limited to his failures with respect to Defendant R. Jackson, Ms. Diamond was sexually assaulted and harassed multiple times by guards and incarcerated men.

347. Defendant Ford, who has final decision-making authority and responsibility for the training and supervision of all GDCP personnel, failed to train and supervise his staff despite knowing of a widespread and pervasive pattern of

98

GDCP personnel disregarding the rampant sexual victimization experienced by transgender women at GDCP, that was likely to continue absent training, and GDC's own written policies concerning the safety needs of transgender people.

348.   As a direct and proximate result of Defendant Ford's failure to train and supervise his staff at GDCP, to which Ms. Diamond may be transferred, as described above, including but not limited to his failures with respect to Defendants A. Smith and L. Smith and Nurse Lucas, Ms. Diamond was sexually assaulted, abused, and harassed multiple times by guards and incarcerated men.

349.   Defendants Lewis, J. Jackson, and Sauls, who are final policy and decision-makers for GDC with respect to medical and mental health care, failed to properly train their staff concerning the medical needs of transgender people with gender dysphoria and GDC's own written policies calling for "constitutionally appropriate care," despite knowing of a widespread and pervasive pattern of failure to provide minimally adequate healthcare treatment by GDC personnel that was likely to continue absent training.

350.   Defendants Lewis, J. Jackson, and Sauls also knew that, based on their failure to train GDC personnel, there was a widespread and pervasive custom of GDC staff disregarding the safety needs of transgender women, failing to place them in women's prisons regardless of their safety needs or to provide them reasonably

safe placements, delaying, deferring, or refusing to reassess the placements of transgender women when sexual assaults occur, and disregarding PREA and GDC's own policies aimed at protecting transgender people from violence.

351.   As a direct and foreseeable consequence of Defendants Lewis, J. Jackson, and Sauls's conscious disregard of the obvious need to train personnel, Ms. Diamond and other transgender people have repeatedly been denied medically necessary care for their gender dysphoria and reasonable protection from foreseeable sexual assault across multiple GDC facilities, and repeatedly been subjected to physical injury and harm. Due to staff supervision and training failures, Ms. Diamond has been subjected to fourteen sexual assaults in the past year alone.

352.   Defendants Ward, Lewis, J. Jackson, Sauls, Ford, and Benton's failure to train and supervise staff or take corrective action to disrupt this widespread pattern of abuse and harm violates the Eighth Amendment's prohibition on cruel and unusual punishment and fundamental notions of decency.

353.   In addition to declaratory and injunctive relief, Ms. Diamond seeks damages from Defendants Ward, Lewis, J. Jackson, Sauls, Ford, and Benton in their individual capacities.

354.   Ms. Diamond has suffered and continues to suffer irreparable physical injury and emotional harm as a result of Defendants Ward, Lewis, J. Jackson, Sauls,

Ford, and Benton's failure to supervise and train personnel, and will continue to suffer substantial and irreparable harm absent immediate relief.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Ashley Diamond respectfully requests that this Court issue:

355.   A declaratory judgment that Defendants Ward, Lewis, J. Jackson, Holt, Toole, Ford, Benton, Atchison, L. Smith, A. Smith, and R. Jackson's actions and omissions in failing to protect Ms. Diamond from the substantial risk of serious harm from sexual assault violate the Eighth and Fourteenth Amendments to the U.S. Constitution;

356.   A declaratory judgment that Defendants Ward, Lewis, J. Jackson, and Sauls's actions and omissions in failing to provide Ms. Diamond with minimally adequate treatment for her gender dysphoria violate the Eighth Amendment to the U.S. Constitution;

357.   A declaratory judgment that the De Facto Placement Ban adopted and applied to Ms. Diamond by Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison violates the Eighth and Fourteenth Amendments to the U.S. Constitution;

358.   A declaratory judgment that the Hormones-Only Policy adopted and applied to Ms. Diamond by Defendants Ward, Lewis, J. Jackson, Sauls, and Atchison violates the Eighth and Fourteenth Amendments to the U.S. Constitution;

359.   Preliminary and permanent injunctive relief restraining and enjoining the enforcement, operation, and execution of the De Facto Placement Ban within GDC by Defendants Ward, Lewis, J. Jackson, Holt, Toole, and Atchison, their officers, agents, servants, employees, appointees, delegatees, successors, attorneys, and other persons who are in active concert or participation with any of them;

360.   Preliminary and permanent injunctive relief restraining and enjoining the enforcement, operation, and execution of the Hormones-Only Policy within GDC by Defendants Ward, Lewis, J. Jackson, Sauls, and Atchison, their officers, agents, servants, employees, appointees, delegatees, successors, attorneys, and other persons who are in active concert or participation with any of them;

361.   Preliminary and permanent injunctive relief requiring that Defendants Ward, Lewis, J. Jackson, Holt, Toole, Atchison, Benton and their officers, agents, servants, employees, appointees, delegatees, successors, attorneys, and other persons who are in active concert or participation with any of them take reasonable affirmative steps to protect Ms. Diamond from sexual assault in GDC custody,

including transferring Ms. Diamond to a female facility to the extent it will safeguard her from ongoing sexual abuse;

362.   Preliminary and permanent injunctive relief requiring that Defendants Ward, Lewis, J. Jackson, Sauls and their officers, agents, servants, employees, appointees, delegatees, successors, attorneys, and other persons who are in active concert or participation with any of them provide Ms. Diamond medically necessary treatment for her gender dysphoria, including without limitation a treatment plan that includes:

a.   Uninterrupted access to hormone therapy, including blood work and monitoring to ensure her hormone levels are therapeutic and in the appropriate range;

b.   Accommodations for female gender expression (including female undergarments, commissary items, and grooming allowances);

c.   Access to hair removal treatments such as electrolysis, laser treatments, or depilatory creams;

d.   Regular appointments with healthcare providers qualified to treat gender dysphoria, so that her ongoing treatment needs can be appropriately assessed and managed;

363.   Compensatory damages against each Defendant named in his or her individual capacity, in an amount adequate to compensate Plaintiff for her harms and losses;

364.   Nominal damages against each Defendant named in his or her individual capacity;

365.   Punitive damages against each Defendant named in his or her individual capacity in an amount to be determined;

366.   Reasonable attorney's fees and costs, including expert fees, under 42 U.S.C. § 1988; and

367.   All other relief that the Court deems just and proper.

Dated: November 23, 2020                    Respectfully submitted,

/s/ *Elizabeth Littrell*
Elizabeth Littrell, Ga. Bar No. 454949
Southern Poverty Law Center
P.O. Box 1287
Decatur, GA 30031
Phone: (404) 221-5876
Fax: (404) 221-5857
Email: beth.littrell@splcenter.org

Tyler Rose Clemons[*]
Southern Poverty Law Center
201 St. Charles Avenue, Suite 2000
New Orleans, LA 70170
Phone: (504) 526-1530
Fax: (504) 486-8947
Email: tyler.clemons@splcenter.org

Maya G. Rajaratnam[*]
Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL 36104
Phone: (334) 956-8307
Fax: (334) 956-8481
Email: maya.rajaratnam@splcenter.org

A. Chinyere Ezie[*]
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
Phone/Fax: (212) 614-6467
Email: cezie@ccrjustice.org

*Counsel for Plaintiff Ashley Diamond*

[*] *Pro hac vice* admission forthcoming